**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2156-21
A-2787-21

ALINA MYRONOVA,

    Plaintiff-Respondent,

v.

SURENDER MALHAN,

    Defendant/Third-Party
    Plaintiff-Appellant,

v.

VIKTORIA MYRONOVA,

    Third-Party Defendant-
    Respondent.

_____

SPACEAGE CONSULTING CORP.,

    Plaintiff-Appellant,

v.

ALINA MYRONOVA,

    Defendant-Respondent,

and

VIKTORIYA MYRONOVA,

     Defendant-Respondent.

---

Argued May 21, 2025 – Decided August 20, 2025

Before Judges Currier, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-0339-21.

Paul A. Clark argued the cause for appellants.

Timothy P. Malone argued the cause for respondent Alina Myronova (Pashman Stein Walder Hayden, PC, attorneys; Tracy Julian and Timothy P. Malone, on the brief).

PER CURIAM

These matters, heard back-to-back, arise out of a decade-long matrimonial litigation culminating in over 100 days of trial. On February 25, 2022, Judge Terry Paul Bottinelli issued a final judgment of divorce (FJOD) and accompanying 338-page comprehensive opinion (Divorce Action). Defendant Surender Malhan[1] appeals from the FJOD, challenging the determinations

---

[1] We refer to Surender Malhan as defendant throughout this opinion. We refer to plaintiff Alina Myronova as plaintiff and the two collectively as the "parties."

regarding custody, child support, equitable distribution, and spousal support. He also appeals from orders compelling him to pay counsel fees and sanctions, as well as the entry of a "gag order" against him.

In the companion case, SpaceAge Consulting Corporation, a company owned and operated by defendant, sued its former employees—plaintiff and her mother, Viktoriya Myronova—alleging they improperly took cash and other benefits from the company (SpaceAge Action). SpaceAge further alleged that Viktoriya failed to return a security deposit which it paid to her as the landlord of SpaceAge's office space. After plaintiff filed the divorce complaint, SpaceAge instituted these actions which were both consolidated with the matrimonial matter. Judge Bottinelli addressed and dismissed SpaceAge's claims in his February 2022 decision and order.

After a careful review of defendant's and SpaceAges's contentions in light of the record and applicable principles of law, we affirm substantially for the reasons expressed by Judge Bottinelli as reflected in his exhaustive, well-reasoned written opinion.

I.

The Divorce Action

A-2156-21

We present the following procedural history and trial testimony pertinent to the issues on appeal.

Plaintiff was born in Ukraine in 1983 and earned undergraduate and graduate degrees. Defendant was born in India in 1960 and earned a graduate degree in computer science. He served in the Indian military for many years before coming to the United States on a work visa in March 1995 and later became a citizen in 2008. Plaintiff and Viktoriya hold green cards only. Plaintiff obtained her green card in January 2011, a month before she filed for divorce.

Since May 1996, defendant has owned and operated SpaceAge, a software services firm. When this litigation began in 2011, SpaceAge had approximately twenty employees and grossed approximately two million dollars in annual sales. The 2019 corporate tax return for SpaceAge listed total income of $441,782.

A. The Parties' Relationship and Marriage

The parties met in Ukraine in May 2003 while defendant was participating in a "romance tour" to find a wife. They disagree as to the date of their marriage. Plaintiff initially asserted they wed in September 2003 in Ukraine and thereafter referred to themselves as husband and wife and filed joint tax returns. However,

4

she has also stated the couple visited India in October 2004 and participated in a "religious marriage ceremony performed by a Hindu cleric." The record includes affidavits from defendant's family members confirming the parties solemnized their marriage in India in October 2004, but both parties concede these affidavits contain at least some false information and were obtained only for immigration purposes.

Defendant alleged he asked plaintiff to be his "life-partner" in the summer of 2003 and began referring to her as his wife in January 2004, although no ceremony had yet taken place. He states the marriage occurred in March 2008 when the parties obtained a "certificate of remarriage" from the Jersey City Clerk in conjunction with defendant's application for citizenship. This certificate stated that the date of the original marriage was October 18, 2004.

B. Plaintiff's and Viktoriya's Relocation to the United States

Plaintiff and Viktoriya came to the United States in the spring of 2004 when defendant arranged for them to obtain visas as employees of SpaceAge. Plaintiff worked in sales and marketing and Viktoriya was employed in administration and human resources.

When Viktoriya first came to the United States, defendant or SpaceAge paid all of her expenses. In 2007, she purchased an apartment in a building

5

adjacent to the couple's home using at least some money provided by plaintiff. Viktoriya purchased a second unit in the building as an investment with financial assistance from both parties.

C. The Parties' Life in the United States

The parties have two children, a son, E.M.,[2] born in March 2006, and a daughter, V.M., born in August 2009.

In 2007, the parties jointly purchased the marital residence, an apartment in a large complex in Jersey City, which defendant had rented since 1996. In 2008, the parties purchased six additional condominium units in the same building and operated them as rental properties. The total cost for the units was approximately $1,650,000. The couple borrowed in excess of $700,000 from banks, approximately $250,000 from the seller, and used the proceeds from a refinance of the marital residence to fund the balance.

Until 2012, and at defendant's direction, plaintiff collected the rental income and deposited it into her own account. She paid the seller's mortgage, but not the bank loans, from that account. Defendant provided plaintiff with the funds to pay the bank loans. At issue here, plaintiff acknowledges transferring

_____

[2] We use initials to protect the children's identities. See R. 1:38-3(f)(6).

6

approximately $291,000, including some of this rental income and her own SpaceAge earnings, to Viktoriya over several years during the marriage.

D. SpaceAge's Office

In 2009, the parties purchased two additional units in the same building for approximately $450,000 to serve as SpaceAge's office. The purchase was made in Viktoriya's name, and plaintiff gave Viktoriya cash for the down payment. SpaceAge then paid Viktoriya rent for the space. Defendant claims that SpaceAge gave Viktoriya $208,000 in four additional rent payments between September 2009 and October 2010, with the intention that she apply them toward the mortgage principal, but she failed to do so.

E. The Florida Timeshares

In December 2010, shortly before the divorce filing, the parties and Viktoriya traveled to Florida for a vacation. During the trip, the parties jointly purchased a timeshare for $27,900 including a mortgage of $25,110 and purchased a second timeshare unit for Viktoriya for an unspecified amount with a mortgage of $16,110. Defendant bought two additional studio units in his own name for a total of $30,000, with a mortgage of $27,000. Shortly thereafter, in early 2011, plaintiff charged the outstanding mortgage balances for an

A-2156-21

unspecified two of these four timeshares to the marital credit card and used approximately $50,000 from the couple's joint tax refund to pay that expense.

F. Plaintiff's Spending Immediately Before the Divorce

In January 2011, plaintiff charged several thousand dollars on a marital credit card for bulk quantities of food, detergent, clothing, and other items. Plaintiff claimed the marriage was breaking down and she needed to prepare for being on her own without any income. She also charged a retainer of $7,500 for her attorney to the card.

G. The Divorce Filing and the Order to Show Cause

In February 2011, plaintiff filed a complaint for divorce in Hudson County and an emergent order to show cause seeking physical custody of the children with supervised visitation for defendant. She alleged the marriage broke down when defendant showed signs of "fanaticism" stating he planned to run for President of the United States. She stated he had a history of mental illness, including a psychiatric hospitalization around 1990 which led to his military discharge. Plaintiff alleged defendant frequently "screamed" at the children if they did not obey him precisely. She also said defendant slept erratically and would take the children for drives in the car overnight or force them to stay awake with him. In January 2011, defendant terminated plaintiff and Viktoriya

A-2156-21

from their roles at SpaceAge because, among other reasons, he believed they stole in excess of $50,000 from the petty cash supply.

During a February 2011 hearing, defendant acknowledged that he planned to run for President of the United States or the Senate and repeatedly discussed leading men into battle. The court granted plaintiff temporary physical custody of the children and provided defendant with supervised parenting time. The court permitted defendant to remain in the marital residence and barred plaintiff from entering it. Plaintiff and the children moved into one of the rental units.

Defendant answered the complaint and filed a twelve-count counterclaim and a third-party complaint against Viktoriya because of her involvement in the parties' finances, broadly describing the situation as a "marriage scam" in which plaintiff allegedly induced him to wed so he would bring her to the United States and support her. The third-party complaint was consolidated with the Divorce Action. Later, Viktoriya moved for summary judgment on the third-party complaint, which the court granted, concluding these claims belonged to SpaceAge. This order led to the filing of the SpaceAge Action.

1. Pertinent Orders During the Ongoing Litigation

a. In April 2011, the court awarded defendant unsupervised parenting time for two hours per day. It ordered defendant to pay plaintiff $3,000 per

month in spousal support and $3,000 per month in child support. The parties and children were to undergo psychological evaluations. The court further ordered defendant to pay $10,000 in fees to plaintiff's counsel as well as fees for various expert costs.

In the next few months, defendant was awarded additional unsupervised parenting time and telephone calls with the children. The court ordered that E.M. begin therapy because defendant alleged that plaintiff was "brainwashing and biasing" the children. Plaintiff was awarded counsel fees several times for defendant's repeated motions to recuse the Family Part judge and for discovery violations.

### b. Plaintiff's Relocation to Live with a Boyfriend

In 2012, plaintiff moved to relocate with the children from Jersey City to Pompton Plains where she had rented a house in her own name and planned to live with her new boyfriend. The court denied the application, but the parties thereafter entered into a consent order, agreeing to a 50/50 parenting time arrangement, under which the children would live with defendant Mondays through Thursdays for school, with extended weekends and additional summer parenting time for plaintiff.

Defendant's subsequent motion to reduce his child support obligation and to terminate spousal support based on cohabitation was denied. The court ordered defendant to collect the rent and pay the mortgages on the couples' rental properties.

c. Defendant's Hiring of Counsel and the Reduction in Spousal Support

Defendant, who was self-represented to this point, retained counsel and moved again to reduce or eliminate his spousal support obligation in light of plaintiff's cohabitation. Defense counsel also operates as general counsel for SpaceAge, his office is located in the SpaceAge offices, and he charges defendant a flat fee of $500 or $1,000 per month to litigate this matter.

The court ordered that spousal support would be fixed at $1,000 per month retroactive to July 1, 2012, when the cohabitation began. The spousal support obligation was suspended entirely for ten months until March 2014, to account for a retroactive credit.

d. The 2013 Pasternak Psychological Evaluations

Dr. Marcy Pasternak, Ph.D., issued a written report arising from her psychological evaluations of the parties and the children on October 15, 2013. She reported that defendant was cooperative but "grandiose and rambling in nature," appearing preoccupied with inspirational leaders throughout history.

11

She found that his behavior, including his desire to run for President and posting of related YouTube videos demonstrated "his fixed sense of self." The expert also noted defendant made numerous inappropriate comments to the children. Although Dr. Pasternak concluded defendant had "compromised judgment," she did not find he could not care for his children.

In discussing plaintiff, Dr. Pasternak observed plaintiff had difficulty accurately perceiving events and was sometimes unable to anticipate the consequences of her actions. The expert also found plaintiff placed her own needs before those of the children, demonstrated by her cohabitation with her new boyfriend.

Dr. Pasternak had significant concerns about the judgment and parenting skills of both parties. Nonetheless, she concluded that both parents loved their children and believed they had their best interest in mind, and that both children were bonded to both parents. She concluded that neither parent was significantly more equipped than the other to be considered the primary residential parent. Dr. Pasternak recommended that the parties share joint legal and physical custody of the children and complete individual therapy.

A-2156-21

### e. Plaintiff's Relocation to Bayonne and Cohabitation with Rothstein

Plaintiff ended her relationship with her boyfriend and he moved out of the Pompton Plains home by July 2013. Thereafter, plaintiff began a relationship with Jeffrey Rothstein. After the relationship began, Rothstein purchased a two-family home in Bayonne in the name of A&J Holdings.[3] Plaintiff and Viktoriya moved into Rothstein's home by October 2013 and custody remained unchanged. Plaintiff initially denied cohabitation with Rothstein because they lived in separate units within the home.

### f. The January 10, 2014 Hearing

Defendant moved to be designated as the parent of primary residence and to reduce both spousal support and child support. He alleged an adjustment was required because plaintiff had obtained new employment and was cohabitating, and his SpaceAge income had declined. The court denied the motions as the trial was imminent, and the issues would be addressed at trial.

### H. The Transfer to Essex County

However, shortly before the trial date, the cases were transferred to Essex County because defendant had sued the Family Part judge in federal court for "deprivation of due process."

---

[3] A&J stood for Alina and Jeff.

## I. Expert Reports as to SpaceAge's Value

In preparation for trial, plaintiff retained Joseph Petrucelli, an accountant at PP&D Accounting Services, to conduct a valuation of SpaceAge. In his report, Petrucelli advised of possible "serious issues of illegality" in connection with SpaceAge's tax returns. He reported an "overstatement of deductions" and "[s]ubstantial amounts of personal expenditures deducted as business expenses." He concluded that SpaceAge was worth $202,552 as of October 2004, $190,182 as of March 2008, and $691,207.83 as of February 2011. After Petrucelli received additional information from defendant, he amended his 2011 valuation of SpaceAge to $857,000. The court ordered the parties to share in the expert's fees.

Defendant also retained an expert, Stephen J. Goldberg, managing partner of Sun Business Valuations, to provide a valuation of SpaceAge. Goldberg concluded that SpaceAge was worth $445,000 as of March 2005, $560,000 as of March 2008, and $870,000 as of March 2011.

## J. The Initial Gag Orders

Around this time, defendant posted information about the litigation on his blog and YouTube. Among other posts, defendant wrote, "I got scammed by my scam wife Alina Myronova and my scam mother-in-law Viktoriya

14

Myronova."  After the parties filed various motions regarding these posts, the court ordered that the parties were "enjoined and restrained without prejudice from speaking with, appearing for an interview, or otherwise discussing" this litigation, any of the parties, the parties' marriage, their pending divorce, or the parties' children with any "reporters, journalists, newscasters, or other agents/employees of newspapers or other media outlets" because "it is not in the best interest of the children to have the parties' divorce litigation discussed in a public forum."  The court stated it would reconsider this order if an expert opined that such statements would not affect the children.

Defendant moved to stay the order pending appeal.  The court denied the application, finding the order was in the children's best interests because they should be protected from public intrusion and it would be detrimental for them to see negative things about either parent on social media.  The court amended its order on May 1, 2014, to include:

> 6. All parties are hereby enjoined and restrained without prejudice from speaking with, appearing for an interview, or otherwise discussing, the parties' marriage, their pending divorce, the within litigation, or the parties' children or making any derogatory or negative statements about the other parties to any reporters, journalists, newscasters, or other agents/employees of newspapers or other media outlets on the grounds that it is not in the best interest of the children to have the parties' divorce litigation discussed

A-2156-21

in a public forum or to have public disparaging statements made about one party by the other party.

7. Any portions of [d]efendant's blog that addresses issues pertaining to this divorce litigation, [p]laintiff, or [Viktoriya] shall be removed immediately. Defendant is prohibited without prejudice from publishing in the future anything to the blog pertaining to this divorce litigation or any negative or disparaging statements about plaintiff or [Viktoriya].

8. Both parties are hereby prohibited without prejudice from discussing or commenting about the within litigation or making any negative or disparaging statements about . . . plaintiff or [Viktoriya] on any form of social media including without limitation, Facebook, Twitter, blogs, Instagram, and Pinterest on the grounds that it is not in the best interest of the children to have the parties' divorce litigation discussed in a public forum or to have negative or disparaging statements made . . . by one party about the other party publicized or disseminated.

The court reiterated that these restraints could be eliminated if an expert opined that such statements would not harm the children. Trial was scheduled for September 2014.

Plaintiff amended her complaint for divorce to include claims that defendant defamed her in his blog. Defendant answered and added multiple new claims to his counterclaims and third-party complaint. The pleadings were amended several more times prior to trial.

16

A-2156-21

## 1. The June 20, 2014 Hearing

After plaintiff moved to modify custody, defendant cross-moved to recalculate child support and suspend spousal support. The court denied both applications. The court also directed defendant to remove the previously-ordered content from his blog, as he had refused to do so. Defendant moved again to vacate the gag order, and the court denied the application. Both parties advised they were not ready for trial and the court postponed the proceeding until March 2015.

## 2. The Federal Court's Decision on the Gag Orders

Defendant and a journalist brought suit in federal court challenging the gag orders as violative of the First Amendment. The federal district court found the orders were unconstitutional because the judge had not made any specific findings regarding the need for a gag order.[4] Thereafter, the Family Part judge scheduled a plenary hearing to "weigh the competing interests of the best interests of the parties' children and defendant's First Amendment rights." However, before this hearing could occur, defendant sued the Family Part judge in federal court and moved for her recusal. A second Essex County judge took over the case.

---

[4] Nichols v. Sivilli, No. 2:14-3821, 2014 WL 7332020 (D.N.J. Dec. 19, 2014).

### K. The 2015 Allegations Against Rothstein

In 2015, defendant filed an order to show cause alleging that Rothstein had physically abused the children. A simultaneous investigation by the Division of Child Protection and Permanency (the Division) resulted in psychological evaluations of both parties, the children, and Rothstein. After reviewing the ensuing expert reports, the court entered an order permitting Rothstein to be present during plaintiff's parenting time and ordered the Division to arrange for therapy for the children.

Shortly thereafter, defendant filed another order to show cause, alleging Rothstein had sexually abused V.M. Defendant also contacted the Division with these allegations. The court initially ordered that Rothstein have no contact with the children.

V.M., who was then five years old, confirmed the allegations but the Division noted that she seemed "coached" because she repeated certain sentences "robotically." E.M., who was then nine years old, told the Division he had not observed any inappropriate touching but only mere tickling. Plaintiff and Rothstein denied the allegations and Rothstein completed a polygraph test successfully. The Division found that defendant was "coaching his children to make allegations" and the allegations of abuse were not established.

18

The newly assigned Family Part judge received a typewritten letter, purportedly from E.M. and V.M., stating that plaintiff put them "through hell," they wanted her to "leave [them] alone," and that plaintiff and Viktoriya had "done something very horrible to [their] dad." The children later admitted that defendant wrote the letter.

L. The June 18, 2015 Hearing and Gag Order

Meanwhile, the plenary hearing regarding the gag orders took place. The court found the orders were invalid and overbroad, except as pertaining to confidential Division material and custody issues. The court vacated the prior gag orders and issued a new one:

> All parties are hereby restrained and enjoined from speaking with, appearing for an interview, or otherwise discussing any custody information to any reporters, journalists, newscasters or other news media employees or from posting any blogs or information not previously posted or disseminated relating to the children or any custody issue in this case pending a further hearing.

The court also ordered an expert psychiatrist to determine if parental alienation occurred, if the children's interactions with the parents were contrary to their best interests and whether publicity would affect the children. However, when defendant informed the expert he intended to record the sessions, the

expert declined to proceed. Two other experts were appointed but defendant failed to pay the fees.

## M. The January 5, 2016 Motion Hearing

Defendant again moved to terminate or reduce spousal support, which remained at $1,000 per month, citing plaintiff's cohabitation, an increase in her income, and the length of the marriage. The court denied the motion and advised the issue would be considered at trial. Although the child support obligation remained fixed at $3,000 per month, defendant stopped paying it.

After hearing a subsequent motion to reduce spousal support, the court reduced the amount by $286 per month because plaintiff had access to health insurance from her employer. The court noted that plaintiff "was not forthcoming" about her access to health insurance.

## N. The 2016 Temporary Restraining Orders

In June 2016, plaintiff obtained a temporary restraining order (TRO) against defendant, alleging stalking, cyber harassment through various online posts, and that defendant interfered with her employment. She subsequently amended the TRO to include harassment.

20

After hearings that spanned over nine days, the court dismissed the TRO, finding plaintiff had not proven the predicate acts. The court found plaintiff was not credible because she was evasive and lacked candor.

O. The Trespass Action

Plaintiff reported her allegations to the prosecutor's office regarding defendant's actions of coming to her residence and hiring a private investigator to follow her. In February 2017, defendant was indicted for stalking and a bench warrant was issued for his arrest.

Defendant was arrested and briefly incarcerated while visiting West Point with the children in April 2017. After plaintiff picked up the children in West Point, she went with them to defendant's apartment, the former marital residence, and used a hidden spare key to enter and permit the children to retrieve their backpacks. Defendant filed a complaint for trespass and conversion against plaintiff. The court consolidated the trespass action with this Divorce Action.

Defendant moved for summary judgment on his trespass claim. He certified that plaintiff was restrained from entering his apartment under a 2011 order entered early in the Divorce Action. Plaintiff responded that she used the key to open the door and then the children went into the apartment to get their

21

backpacks while she waited in the entryway. The court denied the motion, finding defendant's claim was more appropriate as a motion to enforce litigant's rights in light of the co-ownership of the apartment and the 2011 order.

P. Ongoing Litigation

In February 2017, the court learned that previously designated custody experts, including Dr. Pasternak, declined to further participate in this matter because defendant insisted on recording his sessions. Therefore, the court ordered the parties to designate new custody experts and for the children to receive therapy. Defendant had refused to facilitate the previously ordered therapy sessions for the children.

The motion practice continued. At one point in 2017, the court found defendant in violation of litigants' rights for failing to comply with parenting time orders and sanctioned him with counsel fees to be paid to plaintiff's counsel in the amount of $9,231.12.

The court also denied yet another application by defendant to adjust child support, in which he alleged an increase in plaintiff's income. The court conducted a thorough analysis, noting there had been a "precipitous" decline in defendant's income without explanation, but found there was not enough information to modify child support. The court ordered defendant to pay the

A-2156-21

spousal and child support arrears via wage garnishment, in addition to his usual child support obligation, because he had stopped making any payments. Defendant filed several actions in federal court regarding the propriety of the wage garnishment. Those actions were dismissed.

In addition, the court ordered that defendant's obligation to pay spousal support going forward was terminated because the support period now exceeded the length of the marriage. The effective date of the termination would be established at trial.

### 1. The September 2017 Suspension of Defendant's Custody and Parenting Time

In late summer 2017, the children's therapist contacted the Division to report the children alleged defendant had threatened suicide in front of them and made other inappropriate statements. The Division investigated and initially found that defendant regularly kept the children home from school and he required them to share a bed, though E.M. was already ten years old. Specifically, the Division's report stated that defendant kept the children home from school on Thursdays to prevent plaintiff from picking them up from school.

After a hearing, the court awarded plaintiff "temporary sole legal and physical custody of the . . . children" until further order and suspended defendant's parenting time pending the Division's final report. The court advised

23

that if the parties could agree on a supervisor, defendant could continue supervised parenting time.[5] The court also ordered defendant to undergo a psychological evaluation.

### 2. The November 2017 Psychological Evaluation and Temporary Unsupervised Parenting Time

Reports were submitted that did not find defendant had abused or neglected the children.[6] Therefore, the court lifted the restraints on defendant's parenting time, gradually returning to equal, unsupervised parenting time. The court ordered the children to complete psychological evaluations and defendant to participate in individual therapy.

### 3. 2017 Psychological Evaluations of the Children

Dr. Gerard Figurelli, Ph.D., completed psychological evaluations of the children in December 2017. In her interview, V.M. reported that defendant was "very angry" and made her clean his house, which she reported to be "disgusting" and "smelly" with "rats and mice." She told the expert she did not

---

[5] The parties did eventually select a supervisor.

[6] The psychologist later withdrew his report after learning defendant had recorded the session without permission.

A-2156-21

want to sleep there. Dr. Figurelli found that V.M. was afraid of defendant and did not trust him.

E.M. reported that defendant would "scream" at him and "lay in bed and say we were killing him, or grab a knife or a weight and say he wanted to kill himself." E.M. said that defendant once locked them out of his apartment. Dr. Figurelli concluded that both children were significantly impacted by their exposure to defendant's behaviors. He endorsed ongoing supervised visitation, but cautioned that if defendant's problematic behavior continued, visits should be suspended.

### 4. The December 2017 Return to Supervised Parenting Time

Following the reinstatement of defendant's parenting time, there were difficulties between the parties while picking up or dropping off the children. Defendant attempted to pick up the children at school, but administrators refused to release them to him, resulting in him instituting suit against the school. On plaintiff's days to pick up the children, defendant came to the school and recorded the encounters. Defendant told the children he intended to "bring everybody to justice" through this litigation.

Around this time, the children became less affectionate toward defendant and refused to visit him at his home. After a hearing, the court eliminated

25

defendant's overnight parenting time and ordered other parenting time be supervised in a December 22, 2017 order.

### 5. The December 27, 2017 Supervised Visit

The children participated in a supervised visit with defendant on December 27, during which a dispute developed over their planned activity. Defendant began recording the visit against the chaperone's wishes, telling the chaperone that child abuse was not bad because it "sets discipline." While riding in defendant's car, the chaperone observed he was driving over the speed limit at approximately 50-55 miles per hour in a residential neighborhood, and he ignored red lights and stop signs. The chaperone terminated the visit due to safety concerns and because defendant was "highly emotional." The chaperone reported the children were "fearful at times" and defendant's behavior was "cause for concern" and demonstrated a "dangerous physical and emotional environment."

The chaperone also testified during a hearing that on a subsequent visit defendant directed a SpaceAge employee to follow the chaperone and children around to "get evidence." The supervised visits remained in effect. Trial was scheduled to begin in July 2018.

26

A-2156-21

## 6. The 2018 Motion to Enforce Litigant's Rights and the UTMA Accounts

Plaintiff moved to enforce litigant's rights, alleging defendant opened accounts for the children under the Uniform Transfers to Minors Act (UTMA), N.J.S.A. 46:38A-1 to -57 in December 2016 and deposited rental income in excess of $120,000 into the accounts. She stated he then used the funds to pay his own credit card bills or deposited them into his personal accounts, possibly to shield the funds from levy.

In response, defendant stated he mistakenly opened the accounts and subsequently closed them. He alleged that he accounted for any transfers to these accounts. Defendant provided a summary of the transactions showing the deposit of monthly rental income checks, his SpaceAge salary, and SpaceAge's office rental payments from December 2016 through August 2017 into the UTMA accounts and nonspecific withdrawals of nearly all those funds for "[m]ortgage and [m]aintenance [p]ayments" and "[r]efund to [defendant]" for "[e]mployee [p]ayroll."

The court ordered defendant to provide an accounting of the UTMA accounts, and that any credits would be determined at trial. The court also found defendant was in violation of litigants' rights for failing to pay spousal and child support and ordered that he pay the associated counsel fees.

### 7. Ongoing Litigation

The court also appointed a reunification therapist because the children continued to refuse to attend visitation with defendant. However, the therapist soon reported that defense counsel "interfered with her scheduling[] [and] sent her inappropriate documentation," and the expert refused to have any further involvement with the case.

Defendant filed another order to show cause seeking unsupervised parenting time and authority to sell the couple's timeshares. The court declined to modify the custody arrangement but ordered the sale of the timeshares and directed that the proceeds be deposited into a litigation fund. It further ordered the parties to sell some of the rental apartments to pay expert fees. In addition, the court appointed a guardian ad litem (GAL) for the children, to assist the court in its "aim to facilitate the resumption of [defendant's] unsupervised parenting time." The GAL soon reported that she had no concerns about defendant's supervised parenting time but noted the children did not want to visit his home or office.

### 8. Reunification Therapy

In April 2018, the court appointed Dr. Thomas Golden, Ph.D., to serve as the reunification therapist, and the children participated weekly for two months.

Around this time, defendant filed suit against the Essex County judge and moved for his recusal, resulting in the case being transferred to a third Essex County judge.

### 9. The August 2018 Reunification Plan and Unsupervised Parenting Time

In August 2018, the court lifted the supervision requirement for defendant's parenting time and adopted a recommendation from the reunification therapists that defendant have the children on Wednesday evenings and Sunday daytime for two months, followed by overnight parenting time every other weekend. On one of the unsupervised visits, plaintiff arrived late, the children were reluctant to participate, and defendant called the police, reporting the children had been kidnapped.

As a result, the court ordered that defendant's parenting time continue without supervision, with the chaperone facilitating the exchanges. The court ordered both parents to complete individual therapy, but defendant refused to participate.

The court found defendant in violation of litigant's rights for failing to pay his ongoing child support obligation, the previously ordered arrears and the related $9,231.12 counsel fees. It further found a violation of litigant's rights for defendant's failure to sell the apartments and Florida timeshares. The court

29

ordered defendant to obtain a line of credit on the marital residence to establish a fund to pay expert costs. Plaintiff had procured a $200,000 loan with a litigation-funding organization, secured by the proceeds she anticipated receiving in this matter, to pay existing legal bills.

The children continued to be uncooperative and refused to participate in the unsupervised visits with defendant. The court again ordered the parties to participate in individual therapy and directed defendant to participate in therapeutic parenting time as well as separate parenting time, with the chaperone handling the exchanges.

Shortly thereafter, defendant filed suit against plaintiff and the children's therapist alleging they interfered with his custody of the children.[7] The therapist withdrew from this case. The chaperone passed away in November 2018.[8] The court arranged for defendant and the children to have visitation at the courthouse which continued through February or March 2019.

---

[7] We affirmed the dismissal of the complaint on direct appeal. Malhan v. Myronova, No. A-5047-18 (App. Div. Jan. 28, 2021).

[8] Defense counsel refused to believe the chaperone was actually dead and demanded a copy of her death certificate, which was ultimately provided confirming her death.

A-2156-21

### 10. The Sale of the Apartments

In the course of obtaining the court-ordered line of credit on the marital residence, defendant corresponded with a mortgage lender and sent a number of erratic emails stating, "I don't want this loan" and "keep this absolutely confidential since I fear retaliation from" the Essex County judge. As a result, the lender declined to issue the loan. The court found defendant in violation of litigant's rights for interfering with the application process and ordered he pay the counsel fees associated with plaintiff's application for litigation funds.

Prior to trial, the parties sold four of the rental units and the sale proceeds were used for litigation expenses and towards the child support arrears. Some of the monies remained in escrow with plaintiff's attorney. The couple still owned two units at the time of trial, as well as the marital residence. The allocation of the funds in the litigation fund is not specifically challenged on appeal.

### 11. The March 2019 Reunification Plan

The court appointed a new reunification therapist, a therapist for the children, and one of defendant's employees as the parenting facilitator to assist the parties in exchanging the children.

A-2156-21

The reunification therapist withdrew immediately after meeting defendant and the court scheduled additional supervised visits at the courthouse. The newly appointed social worker also withdrew after speaking to defendant to begin reunification therapy. The social worker recommended defendant not have any further visitation.

In May 2019, the court granted defendant's application to retain Les Linet, M.D., as a new expert on custody and parenting time. The court ruled that any custody and parenting reports prepared by the prior expert—Dr. Lidia Abrams, Ph.D.—were barred, although Dr. Abrams could present expert opinions on matters other than custody and parenting time, such as parental alienation.

12. Defendant's Online Activity and the May 31, 2019 Order

The record includes a series of emails between the parties from 2019 in which defendant tried to schedule parenting time and inquired about E.M.'s high school application process. Relevant here, defendant's emails referred to the "Child Predatory Family Courts" and likened plaintiff to "Hitler, Stalin, [the Essex County judge], etc." The record also includes screenshots of defendant's social media posts from this time. The lengthy posts referred to the Essex County judges, as well as the deceased chaperone and the children's prior therapist as "child predators" and compared them to "Hitler, Stalin, Saddam,

32

Bashar al-Assad, Kim Jong-Un, etc." The posts referred to Rothstein as "psychotic" and similarly complained of plaintiff's attorneys.

Plaintiff moved for sanctions for violating the gag order and defendant moved to vacate the gag order, for the Essex County judge's recusal, and to address the custody dispute. During oral argument on the motions, defense counsel referred to the Essex County judge as a "child predator."

In a lengthy written statement of reasons and accompanying order, the court denied defendant's applications and held that trial would proceed promptly in July 2019, beginning with the custody issue. The court also found defendant in violation of the gag order and found the order remained necessary for the children's best interests because they could see defendant's social media posts. The court denied a subsequent identical application.

13. Summer 2019 Custody and Visitation

Both parties submitted expert custody reports in June 2019. During this time, defendant and the children continued supervised visitation at the courthouse. However, beginning in July 2019, the children refused to enter the visitation room with defendant, so some visits occurred in the waiting area. During one visit, the children refused to acknowledge defendant at all. Plaintiff permitted E.M. to miss several of these visits to attend a high school preparation

33

course. The weekly courthouse visits continued until January 2020, when they were suspended due to the children's lack of cooperation.

### Q. The Trial in Essex County

The trial began on July 11, 2019. The court denied defendant's application to present the SpaceAge and trespass actions before a jury. When the court denied yet another motion by defendant for sole legal and physical custody of the children, defendant moved again for the judge's recusal, which the judge denied. As the trial proceeded, ongoing events unfolded during trial that are relevant to the issues on appeal.

### 1. Ongoing Litigation during Trial

By December 2019, the children had enrolled in therapy and defendant again sought to resume traditional visitation. However, after defendant contacted the children's therapist, the program cancelled the therapy. Plaintiff testified that defendant "showed up at [the therapist's office] in his military uniform asking to meet with them and get" the children's medical records. Thereafter, defendant called the office "nonstop . . . call after call" and brought his attorney to their office.

A-2156-21

### 2. The January 27, 2020 Order

During trial, the parties filed a number of motions relating to the gag orders because defendant continued his erratic social media posts. During argument on one of the motions, plaintiff's counsel played a video posted to Facebook in which defendant stated, "Judge . . .[9] give my children freedom. Set my children free or give me death." When arguing with the court about a ruling and order on January 16, 2020, defense counsel insinuated the judge must have been bribed.

In additional posts, defendant stated the children had been "kidnapped" and "psychologically murdered" by the court and custody professionals. Defendant also stated online: "I fear Judge . . . can easily hire someone to assassinate me. From what I have seen, I think he is the head of a huge child predator Mafia gang." Another post by defendant stated: "Someday I know this insanity will end. One day all EVIL does end! One day we will be in our grave!"

The court issued a written opinion and order on January 27, 2020, finding defendant in violation of the gag order and sanctioning him $1,000. The court ordered defendant to complete a psychological evaluation and requested

---

[9] Defendant used the judge's full name in the videos and posts.

plaintiff's counsel to re-enroll the children in therapy. Defendant refused to attend psychological evaluations, prompting further court orders.

### 3. The School Contact Ban

Around this time, E.M. began applying to private high schools, and plaintiff moved to bar defendant from contacting any of the schools to which E.M. applied. She alleged that defendant's involvement might jeopardize the application process because he had sued E.M.'s previous school. The court entered an order barring defendant from contacting any high schools regarding E.M.'s applications until receipt of the psychological evaluation.

The matter was delayed during the start of the COVID-19 pandemic and few proceedings occurred. Defendant had no contact with the children from January 2020 through December 2020.

### R. The Transfer to Bergen County

In July 2020, defendant sued the Essex County trial judge in federal court. Despite the Attorney General's acceptance of service on the judge's behalf, defense counsel went to the judge's home with a process server to personally serve the complaint on the judge approximately one week after the murder of Federal Judge Esther Salas's son at her home. As a result, the cases were transferred to Bergen County. At the time, the Essex County judge had

considered hundreds of motions and orders to show cause applications and issued orders on each and had presided over twenty-seven days of trial.

On December 14, 2020, Judge Bottinelli wrote to the parties advising trial would begin in Bergen County on February 1, 2021 and take place four days a week. The judge granted defendant's request that the trial begin anew. Plaintiff moved in the Supreme Court seeking emergent relief from Judge Bottinelli's decision to start the trial from the beginning. After extensive review of the history of the protracted litigation, including the multiple recusal motions, the Supreme Court held that the trial would resume before Judge Bottinelli using the transcripts and exhibits from the previous days of trial in Essex County. Relevant here, the Court's April 6, 2021 order provided:

> The trial court's order directing that the trial commence anew is reversed, and the matter shall proceed in accordance with this order.
>
> 1. This matter has been reassigned multiple times to different judges after defendant initiated several lawsuits against the judges then presiding over the case. The most recent reassignment took place after substantial proceedings in this family dissolution dispute, namely, testimony taken across twenty-seven partial days of trial.
>
> 2. In light of that history, consistent with Rule 1:12-3(b), and in furtherance of the interests of justice, the following procedural terms shall govern future proceedings. The terms are meant to efficiently bring

37

the matter to closure for the benefit of the parties and children involved.

a. The newly reassigned trial court judge shall proceed to the fullest extent possible on the basis of the transcripts, exhibits, and other evidence or stipulations.

b. The trial court shall review the record developed to date to gain familiarity with the proceedings, testimony, and other evidence. See R. 1:12- 3(b).

c. Following that review, if the trial court concludes that it cannot fairly discharge its judicial duties solely on the record developed as to any particular aspect(s) of the matter, the trial court, pursuant to Rule 1:12-3(c), may supplement the record by recalling any witness, or make such other disposition as the circumstances warrant, including the calling of additional witnesses. In that event, the trial court shall narrowly define the scope of the record to be redeveloped or supplemented with additional witness testimony.

d. The court shall ensure that the record is not duplicated beyond what is strictly necessary to fairly discharge its judicial duties in the interest of justice and with consideration for the financial impact on the parties of replicating any portion(s) of this trial record.

3. The trial court retains the discretion to consider applications for attorney's fees, including pendente lite applications. Such applications may seek fees based on an evaluation of prospective services likely to be performed to bring this matter to a final disposition and

A-2156-21

may call for consideration of the respective financial circumstances of the parties. See R. 5:3-5(c). We also remind court and counsel alike that the trial court is in the unique position to ensure that the extended proceedings that have already occurred, plus additional proceedings necessary to bring this protracted proceeding to closure, do not require a party to bear financially unconscionable fees and costs. The trial court also may, on good cause shown, direct the parties to liquidate or otherwise make assets available to the extent the court deems necessary to permit either party to fund the litigation. Ibid.

4. The Court notes that this matter has been assigned to a fifth judge. The voluminous record before the Court, as well as the parties' submissions keyed to this issue, support the conclusion that the prior judges recused themselves in this matter based in part, if not exclusively, on defense counsel's course of conduct, which included the filing of six federal lawsuits against the judges presiding in this matter. Going forward, the filing of any new lawsuit or claim shall not constitute the basis for automatic disqualification or recusal. The Code of Judicial Conduct, Rules of Court, and other applicable authority shall continue to govern any challenge to a judge's participation in this matter, and participation will not be terminated unless prohibited by that authority.

5. Finally, the trial court shall enforce all operative orders governing the conduct of the parties and counsel appearing in this matter. The trial court shall retain the discretion to enter future orders restricting the conduct of the parties and their counsel, and to sanction counsel for violations of such orders and other willful conduct obstructing the adjudication of the proceedings or violative of the decorum and civility expected of licensed officers of the court in and out of the judicial

forum. To date, defense counsel's conduct has included describing the presiding judge as a "child predator" in court, and driving to the presiding judge's home with a process server roughly one week after a tragic shooting at the home of a federal judge. In short, aggressive, hostile conduct need not be tolerated. Purported violations of the court's orders, and all other proceedings for sanctions, shall be considered under the authority of Rule 1:10-2; that applies to conduct occurring in court or outside of the courtroom.

Trial testimony began before Judge Bottinelli in May 2021 and continued through December 2021.

### 1. The Skype Call with Defendant's Father

In April 2021, defendant filed an order to show cause to facilitate a Skype call between the children and his father, who had been released from his life prison sentence in India due to illness. Plaintiff had no objection to the call. Despite the court's earlier reunification plans, and the stated purpose of the motion, defense counsel inserted language into the proposed order that provided defendant "a substantial amount of meaningful parenting time" and "granted [defendant] temporary sole, legal, and physical custody of the parties' two minor children until further order of the [c]ourt."

Judge Bottinelli granted the Skype call but found defendant in violation of litigant's rights for making the same request for parenting time that had been denied multiple times. The judge ordered defendant to pay plaintiff's counsel

the costs of defending this motion in the amount of $4,597.50. The judge also sanctioned defense counsel $500 for his failure to comply with Rule 1:6-2(c) requiring a conference with opposing counsel, noting that the Supreme Court's order had "expressed concern of the aggressive, hostile conduct by [d]efendant's counsel" and "instructed that it is proper to sanction [c]ounsel." The judge found that defense counsel had "inserted language into the proposed order . . . to, in effect, get around prior orders," and described counsel's conduct as "outrageous."

2. The Scripts

After hearing allegations during trial that defendant required the children to use scripts when speaking with plaintiff and the Division, Judge Bottinelli requested defendant to provide copies of any scripts, as they were not produced during discovery. Defendant submitted a seventy-page document including various scripts he required the children to use in phone calls and emails from May 2015 through January 2017, when E.M. and V.M. were approximately nine and six years old, respectively.

One such email that E.M. was required to send read, in part:

> Mommy you have put me, my sister and my dad through hell. Please leave us alone. You do mean things to people and then you act as if you are a saint.

For over four years I have seen that you have been lying, stealing and manipulating.

A script stated:

Mommy, when we are out in the sun, can you get us sunhats, you wear very good sun hats. Daddy takes very good care of us, why you cant [sic] take good care of us. Don't you love us? Do you really love us?

Another script stated:

My dad got you from Ukraine, my dad got your mother from Ukraine, my dad got you green card, my dad got your mom green card, my dad gave you a job in his business, my dad gave your mom a job in his business, my dad gave you high salary, my dad gave your mom high salary, and now you file a restraining order against him? Mommy are you a normal person?

3. Plaintiff's Case at Trial

Plaintiff testified consistently with the documentation in the record as discussed above. As to the date of the marriage, she testified that the parties had a spiritual ceremony on September 21, 2003, followed by a religious ceremony in India in October 2004, and a "remarriage ceremony" in Jersey City in 2008.

Plaintiff described the custody history of this matter including difficulties exchanging the children because defendant would "make a scene" and give a "speech of how evil [she was] and [she was] a little scammer." She testified that she encouraged the children to participate in defendant's parenting time but they

42

were reluctant to do so.  She said she did not force the children to visit with defendant but she did not object to them seeing him.

She testified that both E.M. and V.M. did well in school and E.M. had perfect attendance.  She stated that both children earned scholarships to attend private schools.  Plaintiff testified that defendant refused to take the children for therapy, contrary to various court orders and he did not understand the children's needs.

When asked about the gag orders, plaintiff testified that defendant repeatedly violated the orders with his online posts, several of which were admitted into evidence.  Plaintiff read a post in which defendant wrote:

> Judge . . . , I did not come into this world to surrender our precious freedom to you.  Please let me rephrase what men such as Mahatma Gandhi, Dr. Martin Luther King, Nelson Mandela said[:] "You may kill me, you may take possession of my dead body, but you will never take possession of my precious freedom.  I will never allow you to take possession of my freedom."
>
> Judge . . ., you can kill me.  You can take possession of my dead body, but you will not take possession of my freedom or my children's freedom. Give me liberty or give me death.

In another post, defendant wrote:

> This ransom demand, in Family Court Judge . . . calls it settlement offer, welcome to America, Judge . . . is

leading the way, showing the world how we do insanely evil crimes the American way.

Think if you are standing in front of Stalin, Hitler, Saddam, North Korean dictator, how terrified we will feel. One wrong smile, one wrong word, one wrong step and we will be sent to the gas chamber, to the concentration camp, or be executed by a firing squad.

In a video entered into evidence and addressed to the Essex County judge, defendant stated, "[d]o you get paid enough as a judge? I promise you whatever money you make as a child predator, I'll pay you. Just don't kidnap children anymore, please. Please, for heaven's sake, for God's sake."

Regarding financial matters, plaintiff described her life in Ukraine before the marriage and testified that she and Viktoriya lived comfortably. She stated they brought about $50,000 in cash and $29,000 on "debit cards" when they came to the United States. She detailed various deposits of some of their funds into United States banks and the purchase of several certificates of deposit.

Plaintiff described the marital finances as intermingled with those of both SpaceAge and Viktoriya. She testified that she and Viktoriya followed defendant's instructions about what to pay and from which account.

Plaintiff admitted transferring various sums of money to Viktoriya throughout the marriage but denied concealing these payments. She transferred

44

a total of roughly $291,000 to Viktoriya between 2006 and 2010 as part of "a plan of how to address the finances" with defendant's consent. She clarified the $291,000 estimate included proceeds from her own certificates of deposits and payments toward Viktoriya's mortgage pursuant to defendant's instructions, as well as money toward the down payments on Viktoriya's two apartments. Plaintiff said defendant knew about the transfers as they were completed at his direction. She also stated she charged items for Viktoriya to the parties' credit card with defendant's consent.

Plaintiff testified regarding her February 2011 Case Information Statement (CIS), where she reported $64,000 in annual earned income for herself and $276,000 for defendant, both from SpaceAge. She acknowledged it included some expenses that she did not actually incur, such as daycare costs and a car payment.

Plaintiff acknowledged that the mortgage payment decreased from approximately $5,000 per month to approximately $3,000 per month in 2012, but defendant continued to pay her $5,000. She confirmed she repaid the amount owed to defendant according to the court's order.

Plaintiff testified that her annual salary at the time of trial was approximately $92,000, although she earned $104,000 in 2019, working as a

recruiter. She provides the children with medical, dental, and vision insurance. Plaintiff stated the children's personal expenses have increased as they've gotten older and began taking musical theater lessons, taekwondo, art classes, and swimming. She said her current expenses for her and the children totaled $12,140 per month, or approximately $145,000 per year. Plaintiff estimated her counsel had billed her approximately $2 million in counsel fees to that time.

Plaintiff described her job at SpaceAge during the marriage, which paid approximately $32,000 per year. She testified that she and her mother contributed to growing the business. Plaintiff stated that neither she nor Viktoriya had control of the "books" and that defendant authorized all checks and payments.

Plaintiff testified that the office space for SpaceAge was purchased in Viktoriya's name because the parties could not qualify for any additional mortgages and because SpaceAge was involved in litigation. She said she and defendant provided Viktoriya with at least $48,000 toward the down payment.

After the purchase, SpaceAge paid monthly rent to Viktoriya by check, though not in regular installments, and there was no lease. She said defendant bought the units from Viktoriya in May 2011 and paid approximately $90,000 "to cover the taxes expense" and also assumed the existing mortgages.

A-2156-21

Regarding petty cash, plaintiff testified that defendant frequently wrote checks to her, Viktoriya, or other SpaceAge employees and instructed them to cash the checks for "petty cash," often in $3,000 or $5,000 increments, for his own use. She testified that defendant managed this cash, which was kept in his briefcase. She denied stealing petty cash from SpaceAge.

As to cohabitation, plaintiff confirmed she shared the rent with a boyfriend for approximately a year between June or July 2012 and June 2013. She testified that she began a relationship with Rothstein in spring 2013 and signed a lease in October 2013, to rent the lower unit in his two-family home. Plaintiff said she sometimes slept upstairs with Rothstein in 2013, but denied being in a marriage-like relationship with him at that time. She said they shared a credit card beginning in January 2014 and he added her to his AAA membership. Eventually plaintiff moved into the upstairs unit with Rothstein and she stopped paying rent in late 2017 or early 2018.

Plaintiff stipulated to cohabiting with Rothstein beginning in August 2016. At the time of trial, plaintiff, Rothstein, and the children lived in the upper unit and Viktoriya and her husband lived in the lower unit but did not pay rent.

Paul Dasher, Ph.D., a psychologist, testified for plaintiff as an expert on custody and parenting time. He performed psychological and bonding

47

evaluations of E.M. and V.M. in October 2018, and separately interviewed the parties, Viktoriya, and Rothstein.

Dr. Dasher testified that E.M. reported that defendant coached him on how to speak to Division investigators and caseworkers. Dr. Dasher stated the children felt defendant was "too self[-]absorbed" and did not "connect[]" with them. The expert said the litigation was distressing, confusing, and disruptive to E.M.

Dr. Dasher testified that V.M. reported that defendant often held a knife to his own heart and said he would kill himself. V.M. said there were rats, mice, ants, and roaches in defendant's home, and that he exposed his naked body in the children's presence. Dr. Dasher said the children wished to remain living with plaintiff.

The expert said the children engaged appropriately with plaintiff and appeared comfortable. When he observed them with defendant, Dr. Dasher said they were "not fearful" and laughed with him occasionally. However, defendant struggled to connect with the children emotionally.

Dr. Dasher testified that plaintiff was intelligent, supportive of the children, and understood their needs. He stated the children's home life with

48

plaintiff and Rothstein was happy and normal. He did not find there was any parental alienation of defendant by plaintiff.

As to defendant, Dr. Dasher testified he had underlying psychiatric problems involving delusional thinking and grandiosity and also demonstrated hypervigilance which bordered on paranoia. He concluded defendant had narcissistic personality traits, bipolar disorder, and misconstrued the boundaries of appropriate behavior. Dr. Dasher determined defendant struggled to validate the children's feelings, which would adversely affect the possibility of reunification. He further informed that defendant's lack of insight and poor judgment were major contributors to his difficulties with the children.

Dr. Dasher also testified about the impact of publicity on the children, opining defendant's social media posts could have an adverse impact on them. He stated the children would be embarrassed if their personal information were discovered by their peers. He emphasized that the internet postings were "a major contribution to their estrangement."

Dr. Dasher recommended that plaintiff maintain primary residential custody of the children and be granted legal custody due to defendant's psychiatric illness, his negativity toward plaintiff, and his difficulties with co-

A-2156-21

parenting. He said defendant should meet with a psychiatrist and psychologist and that such treatment should be a condition of any supervised visitation.

Two of the reunification therapists appointed by the court also testified, describing the events that caused them to withdraw from the appointment.

Petrucelli testified for plaintiff as an expert in forensic accounting and business valuations regarding the value of SpaceAge. He stated he observed "significant IRS problems" with defendant's business practices. He provided the court with his valuations of SpaceAge: $202,552 as of October 2004; $190,182 as of March 2008, and the amended valuation of $857,000 as of February 2011.

4. Defendant's Case at Trial

Defendant testified that the marriage began in 2008 with the "remarriage ceremony" in Jersey City although he admitted the couple participated in a September 2003 ceremony in Ukraine and thereafter began referring to each other as husband and wife. He denied there was a wedding ceremony in India in October 2004. Defendant said he filed joint tax returns with plaintiff in 2004 indicating they were married, but he was lying about the marriage at that time.

Regarding custody, defendant testified he had a very good relationship with his children until 2017. He denied ever yelling at the children, telling them about the court proceedings, or threatening suicide. Defendant conceded there

were mice, but not rats, in his home. He did acknowledge the children were habitually late or absent from school while in his care. He also admitted preparing scripts for the children to question plaintiff about her conduct throughout this matter.

Defendant testified that he did not need therapy and he did not want the children to have therapy. He acknowledged he did not complete the last court-ordered psychological evaluation, stating the doctor would not meet with him.

Defendant stated his financial affairs and those of SpaceAge were "closely tied up." He testified that SpaceAge had revenue of approximately $1.9 million in both 2010 and 2011, $1.79 million in 2012, $1.25 million in 2013, an unspecified amount in 2014, $1.04 million in 2015, and $837,875 in 2016. He said that he, through SpaceAge, paid $12,000 per month to rent the offices from Viktoriya during her ownership of the space.

Defendant acknowledged that he decided how much to pay himself from SpaceAge depending on the business revenues. He testified his gross income from SpaceAge was $276,000 in 2010, $275,000 in 2011, $487,530 in 2012, $440,000 in 2013, $265,000 in 2014, $205,000 in 2015, $225,000 in 2016, $61,000 in 2017, $9,999.99 in 2018, $13,333 in 2019, and $18,333.33 in 2020.

A-2156-21

He acknowledged that he also earned rental income paid by SpaceAge arising from its tenancy in the two units.

Defendant testified that SpaceAge's revenues began to decline around 2014. He said the company had four employees at the time of trial but had once employed twenty-five people. He testified that SpaceAge earned less than $100,000 annually at the time of trial and that he earned approximately $50,000 per year from the company.

Regarding plaintiff's and Viktoriya's role at SpaceAge, defendant admitted that he managed the financial affairs and signed any checks that Viktoriya prepared. He said he was unaware how much plaintiff and Viktoriya took as petty cash from SpaceAge.

In discussing marital spending, defendant testified that the family lived a frugal lifestyle during the marriage and kept spending to a "bare minimum" with the goal of saving for the future. Defendant estimated the couple's expenses in 2010, noting SpaceAge paid a lot of them.

Defendant testified that the couple purchased the marital residence for $360,000 in cash in 2007, using some of his savings and some money earned since 2004 and renovated the apartment at plaintiff's insistence for approximately $250,000.

A-2156-21

Defendant also testified regarding plaintiff's spending on the marital credit card, beginning in December 2010, when plaintiff spent approximately $13,000 that month. He stated plaintiff spent a similar amount on the marital credit card in January 2011, and $31,445 in February 2011, including $7,500 to her first attorney and $1,600 at Restaurant Depot. In March 2011, plaintiff spent $68,951, which included the $52,000 payoff for two of the timeshares and $7,718 in April 2011, when his spousal support obligation began.

Defendant described his personal expenses since the divorce filing, stating he purchased many toys for the children in 2011 to deal with the "trauma" of the divorce, including a piano, guitar, stethoscopes, and yoga mats. He testified that he paid for V.M. to attend nursery school and dance lessons when in his care beginning in 2012.

Defendant admitted opening the UTMA accounts for the children in 2016 and initially testified that he did so "to motivate them" because he was teaching them programming. However, he then conceded opening the accounts "to avoid a levy" on his own funds by the probation department. He admitted making significant deposits into these accounts and then withdrawing the money, including withdrawals of approximately $120,000 and $44,000. He stated he

A-2156-21

never used any of the money deposited into these accounts for the children's benefit.

The GAL testified consistently with the documentation in the record, stating this was an "awful, awful case" and there was "no good answer" as to custody. She stated that "each of these parents are so bad" and "it's too late" for these children. The GAL testified to the emotional and physical abuse that both parents "visited upon these children by using [them] as pawns in their fight" and that the children should be placed with the "least worst" parent.

Dr. Linet testified for defendant as an expert in the field of child and adolescent psychiatry. He described his involvement in this matter dating back to 2018, when he met with the parties and the children, and also listened to recordings of the children's conversations with defendant. He testified that he performed a psychiatric assessment of defendant and found no mental disorder.

Dr. Linet testified that the children demonstrated "splitting," a concept where they found plaintiff to be entirely good and defendant to be entirely bad. He concluded that an "external influence" resulted in the children feeling this way about defendant. Dr. Linet testified that the children experienced what he considered to be delusions about rats in defendant's home and that their grades would suffer when living with him. He stated the children learned apparent

falsehoods about defendant and believed them, including that he might commit suicide.

Dr. Linet described plaintiff as conducting a "campaign of denigration" against defendant and concluded this was a severe case of parental alienation. On cross-examination, the expert admitted that he also observed some parental alienation of plaintiff by defendant.

Dr. Linet recommended that the children be separated from plaintiff for ninety days, with no contact at all, and temporarily transferred to defendant's custody in order to ameliorate the parental alienation. He testified this would allow the children to "work through the distortions in their mind[s]." Thereafter, custody could be shared and the children should be involved in therapy.

Dr. Abrams testified for defendant. She was the initial custody expert retained by defendant but was later replaced by Dr. Linet. She admitted that while she had submitted preliminary reports, she had not prepared a final report in this matter because she could not make a final recommendation about custody.

In keeping with the May 23, 2019 Essex County order, Judge Bottinelli ruled that Dr. Abrams could not render any opinions as to custody or parenting time, but she could provide expert opinion regarding her psychological evaluation of defendant and the possibility of parental alienation. The court was

A-2156-21

astonished and dismayed to hear Dr. Abrams state that defendant's counsel invited her to listen in to the court's confidential virtual interview with the children, contrary to the court's instructions. Dr. Abrams said she logged into the interview but when she could not hear everything, she left the Zoom call.

Dr. Abrams testified that she completed a psychological evaluation of defendant in 2011. She diagnosed him with an "adjustment disorder not otherwise specified" but found no psychosis, delusions, or hallucinations. Dr. Abrams evaluated defendant again in 2017 and concluded that he was not suicidal and had no diagnosable psychological condition, although she found he had poor social skills and "mild Asperger's" syndrome. The expert testified that defendant was "not able to connect with people properly" but was "very high functioning" and a "very smart guy."

Dr. Abrams stated she observed a dramatic shift in the children's attitudes toward defendant during the litigation. She concluded there was parental alienation of defendant by plaintiff that was responsible for the children's rejection of their father.

Dr. Golden, who served briefly as a reunification therapist in 2018, opined that the children had experienced an "artificial separation" from defendant, who posed no harm to them. He stated he and the GAL jointly concluded that

defendant's visits with the children should not be supervised. He testified that reunification therapy was unnecessary because "more time of [only] father and children" would allow for normal content in visitation.

Luis Caceres, defendant's former employee, testified that he observed the children at the office prior to 2017, and they showed affection toward defendant most of the time. He said he never observed defendant display anger around the children. Another former employee testified similarly.

Vinh Dang, the children's karate instructor in 2017, testified that the children were respectful to defendant and were not afraid of him. He never heard defendant talking about plaintiff in front of the children. Dhuliben Patel, defendant's housekeeper, testified she kept defendant's home clean and cooked for him. She stated defendant took very good care of the children when they lived with him.

Defendant also presented testimony from several friends and neighbors to corroborate that he had a good relationship with the children before 2017. Several relatives testified that the parties did not participate in a wedding ceremony in India in October 2004.

Judge Bottinelli conducted in camera interviews of the children on August 19, 2021. V.M., who was then twelve years old, stated that when she lived with

57

defendant, he did not permit her to have hobbies and only allowed her to read biographies or learn JavaScript. She said defendant got mad when she played computer games or read anything but biographies and yelled at her regularly. She reported that when defendant was mad at her, he would take a knife and hold it to his chest, lock himself in his room, or pretend to be dead. V.M. stated defendant once smashed E.M.'s iPad. He did not allow her to have friends at the residence.

V.M. acknowledged that her feelings for defendant changed around 2017 because she got older. She stated she was uncomfortable with defendant's frequent videotaping of their interactions and he made E.M. feel badly about gaining weight. She told the court that for her to have a relationship with defendant, he would "have to change so drastically" and be "willing to learn and grow."

When asked about her mother, V.M. said plaintiff was respectful and listened to the children. She stated plaintiff required her to join the calls with defendant but could not force her to speak to him. She spoke positively about Rothstein and said he was "fun to be around" and never hurt her.

E.M., who was then fifteen years old, told the court that his academics and school attendance improved when he began living with plaintiff full-time. He

A-2156-21

stated defendant was "very egotistical" and "always thinks he's right." He reported that defendant was unwilling to compromise and too focused on himself. He stated that when living together, defendant did not allow him to spend time with other children and gave them only boiled vegetables for dinner.

E.M. stated it was "horrible" to live with defendant and he was "simply surviving" defendant's "fits of anger." He reported that when angry, defendant repeatedly held a knife to his own chest and said "just kill me now." E.M. said there were mice in defendant's apartment and defendant wrote phone numbers and quotes in chalk on the walls of the home.

E.M. told the judge that defendant gave him scripts of what to say when speaking with plaintiff. He also stated that defendant gave him a list of questions and answers before meeting with one of the psychologists. E.M. reported that to have a relationship with his father, defendant would have to "come to the realization that he's not always right."

E.M. stated that plaintiff sacrificed a lot for the children. He told the court he wished to remain living with plaintiff, and not see defendant unless defendant took steps to change.

A-2156-21

## 5. The Fee Application

Following trial, plaintiff's counsel provided a certification of services in support of her fee application, seeking $1,980,303.20 in counsel fees for more than 4,500 hours of work from January 2017 through the end of trial. Counsel attached the retainer agreement and supporting invoices. Defendant did not submit any certifications or other written documentation regarding his demand for counsel fees, though at trial he requested at least $15,000 in counsel fees from Viktoriya and a refund of certain fees previously awarded to plaintiff.

## S. Judge Bottinelli's Opinion

As stated, Judge Bottinelli entered an FJOD and comprehensive written opinion on February 25, 2022. We summarize the judge's conclusions here and discuss them more fully as necessary to address defendant's contentions before this court.

Judge Bottinelli awarded full custody of the children to plaintiff but permitted defendant to move for parenting time after completing therapy. As to equitable distribution, the judge awarded plaintiff $130,888, or 20% of the growth in the value of SpaceAge from 2004 to 2011, and directed the sale of all the remaining apartment units with the allocation of the proceeds as discussed

below. The judge awarded plaintiff the one-bedroom timeshare purchased jointly, and defendant the two studio units he had purchased.

As to spousal support, the judge found defendant owed plaintiff, after certain credits, $252,054. The judge terminated defendant's spousal support obligation as of August 1, 2016.

Regarding child support, the judge awarded plaintiff $675 per week going forward and found that defendant owed arrears of $113,988. He also directed that $224,985 be paid from the litigation fund escrow to plaintiff to establish college savings plans to compensate the children for the funds defendant withdrew from their UTMA accounts.

The judge sanctioned defendant $35,000 for violation of various orders, failing to attend psychological evaluations, and for having Dr. Abrams covertly listen-in on the children's in camera interviews. The judge awarded plaintiff $1,980,303.20 in counsel fees and directed that $252,054 of that be entered as spousal support arrears, and $1,728,249.20 be entered as child support arrears.

The judge dismissed defendant's trespass action, as well as his remaining claims against plaintiff and Viktoriya including those for dissipation, fraud, theft, and recoupment of health insurance proceeds. He also expressly dismissed

61

all claims by SpaceAge against plaintiff and Viktoriya and denied defendant's motion to vacate the gag orders.

## II.

## The Appeal

We turn to defendant's specific contentions on appeal, reiterating our affirmance of Judge Bottinelli's meticulous opinion and reasoning, which narrows the degree to which we must address each issue.

### A. Custody Orders

Defendant argues that the multiple judges handling the litigation erred in their pendente lite orders and that Judge Bottinelli erred in his final custody ruling.

A parent's right to enjoy a relationship with his or her child is constitutionally protected. In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Parental rights, though fundamentally important, are not absolute. Id. at 347. "In custody cases, it is well settled that the court's primary consideration is the best interests of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007).

Appellate courts owe substantial deference to the Family Part's findings of fact because of that court's special expertise in family matters. Cesare v.

A-2156-21

Cesare, 154 N.J. 394, 411-12 (1998). In reviewing a ruling by a Family Part judge, "we defer to factual findings 'supported by adequate, substantial, credible evidence' in the record." Landers v. Landers, 444 N.J. Super. 315, 319 (App. Div. 2016) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)). Deference is particularly warranted "when the evidence is largely testimonial and involves questions of credibility." In re J.W.D., 149 N.J. 108, 117 (1997). We will reverse only if the trial court's factual findings are so "manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974).

However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We also "defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall, 222 N.J. at 428 (quoting Cesare, 154 N.J. at 412). But "[a]ll 'legal conclusions, and the application of those

conclusions to the facts, are subject to our plenary review.'" Slutsky v Slutsky, 451 N.J. Super. 332, 344-45 (App. Div. 2017) (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

### 1. Pendente Lite Orders

Defendant argues the court erred when it suspended his physical custody without a plenary hearing in 2011, and his legal and physical custody without a plenary hearing in 2017 and 2018. As a threshold matter, any pendente lite custody rulings here are moot because a final custody determination has been made. See Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 257-58 (App. Div. 2006) (An issue is moot when the decision sought "can have no practical effect on the existing controversy.").

Notwithstanding, our careful review reflects the court acted within its afforded discretion and relied upon credible evidence in its decisions to temporarily suspend defendant's custody and parenting time in the cited pendente lite orders. Although a plenary hearing is encouraged as part of a significant and disputed custody change, K.A.F. v. D.L.M., 437 N.J. Super. 123, 138 (App. Div. 2014), the suspensions here were emergent, intended to be temporary, and followed by intensive efforts toward reunification which were unsuccessful due to the described circumstances of this case.

As to the 2011 suspension, the court clearly acted to protect the children from a credible concern in light of defendant's erratic behavior and then, after finding no risk of harm, worked diligently to afford defendant additional parenting time. Further, defendant's subsequent consent to the 50/50 custody arrangement in 2012 undermines his assertion of error on this point.

Similarly, as to the September 2017 suspension of defendant's legal and physical custody, the court again acted on an emergent basis to protect the children from a threat of harm alleged by an appointed professional. Thereafter, upon receipt of defendant's psychological evaluation, the court swiftly ordered the gradual return to shared physical custody. During that process, the therapist's report and chaperone's testimony demonstrated that the children were at risk of harm in defendant's custody, which supported the court's February 2018 decision to only allow defendant supervised visitation. Thereafter, the court lifted the supervision requirement and the only limitation on defendant's parenting time was the children's refusal to spend time with him.

Further, although the court declined to schedule a plenary hearing after the 2017 and 2018 suspensions, it agreed to consider the custody issues at the then-pending trials, which were repeatedly delayed because of the dilatory actions of defendant and his counsel. In the interim, the court expressly

provided for several "reunification plans," which were thwarted by defendant's litigiousness after numerous professionals withdrew from their appointments. Even through the time of trial, and during the COVID-19 pandemic, the court worked to facilitate phone calls and courthouse visits for defendant with the children despite the children's unwillingness to participate.

2. Final Custody Ruling

Defendant contends Judge Bottinelli erred in awarding full legal and physical custody of the children to plaintiff. He does not cite to a specific error in the judge's factual findings.

N.J.S.A. 9:2-4(c) provides factors which a court must consider in making an award of custody. Judge Bottinelli considered each factor and referenced "the pertinent statutory criteria with some specificity," as required under Kinsella v. Kinsella, 150 N.J. 276, 317 (1997) (quoting Terry v. Terry, 270 N.J. Super. 105, 119 (App. Div. 1994)).

As to the parents' ability to agree, communicate and cooperate, the judge found: this was a high-conflict case and defendant continued to "portray himself as the victim" rather than address his own shortcomings; defendant coached the children to make allegations and respond to the Division; defendant failed to comply with court orders that he and the children complete therapy; defendant

would benefit from therapy, and his behavior was "consistent with actions taken by people with Asperger's Syndrome" as well as narcissism and "signs of psychopathology which place him on the autism spectrum" as diagnosed by Drs. Abrams and Dasher.

Regarding the parents' willingness to accept custody and any history of unwillingness to allow parenting time, the judge found:  both parents sought custody; plaintiff failed to take affirmative steps to support defendant's parenting time; and defendant acted in a manner which affected his ability and opportunity to have a relationship with the children.

As to the interaction and relationship of the children with parents and siblings, the judge first stated this factor was discussed throughout his analysis. He found the children had a close relationship with each other.  The judge noted that defendant presented videos to demonstrate his own relationship with the children, but concluded that these videos were likely a part of defendant's "litigation tactics."

Regarding the history of domestic violence, the judge recited the 2016 TRO, as well as the trespass action.  The judge went through the events leading up to defendant's filing the trespass action and found defendant had not substantiated the claim as he failed to present any evidence of damages.  The

judge stated: "By advancing such a claim, . . . defendant . . . act[ed] in bad faith and . . . making th[at] argument only ma[de] him look petty." He found defendant displayed "shameful actions" throughout the litigation.

The judge noted the 2016 TRO alleging the predicate act of stalking was dismissed but also found defendant testified during this trial that he had hired a private investigator to secretly follow and surveil plaintiff.

As to the safety of the children and the safety of either parent, the judge found that neither the children nor the parents were at risk of physical abuse, but that defendant subjected the children to "psychological maltreatment."

Regarding the preference of the children, the judge described his interviews with them and found: They preferred to remain in plaintiff's household until defendant learned how to listen to them and treat them with respect and the children's concerns about defendant were legitimate and unaddressed, and prompted their rejection of him.

As to the needs of the children, the judge found that plaintiff failed to put the children's needs above her own when she moved in with her first boyfriend and left the children in defendant's custody during the school week. However, plaintiff was able to meet the needs of the children and had made sacrifices to

A-2156-21

provide them with a stable home environment, noting their improved academics following the 2017 custody change.

Relatedly, as to the stability of the home environment offered, the judge found that plaintiff had provided a loving and stable home environment. Conversely, when the children spent significant time with defendant, the judge stated the environment did not permit them to thrive educationally, socially, or emotionally. He found they matured and enjoyed privacy in plaintiff's home.

Regarding the quality and continuity of the children's education, the judge found that plaintiff made their education a high priority, helping them with their homework and facilitating E.M.'s attendance at private school.

As to the fitness of the parents, the judge found that defendant's psychological fitness was in question, referencing his erratic online posts and the reports that he threatened to kill himself and that he ignored orders to engage in therapy. The judge found defendant demonstrated "aggressiveness, hostility, vindictiveness, and meanness" throughout this matter. Regarding the geographical proximity of the parents' homes, the court found they lived near one another.

As to the extent and quality of the time spent with the children, the judge again found that the videos defendant produced were likely "litigation based in

A-2156-21

order to bolster his position." The judge further found that his witnesses who testified positively about his relationship with the children had limited experience with, and little exposure to, the children.

Regarding the parents' employment responsibilities, the judge found this factor not applicable because defendant was self-employed and plaintiff had been able to handle work and parenting responsibilities. As to the age and number of the children, the judge reiterated its earlier factual findings.

The judge additionally commented on defendant's coaching of the children to speak ill of plaintiff, and included quotes from scripts that defendant provided to them. The judge stated that the children were forced to say "awful and untrue things about their mother and grandmother," and were exposed to a "constant litany of complaints" by defendant which resulted in their fear and anxiety.

Judge Bottinelli concluded there was "justifiable disaffection . . . and . . . animosity" by the children toward defendant which was not "based on alienation perpetrated by their mother." As a result, he found it was in the children's best interest to remain living with plaintiff, and declared her to be the parent of primary residence. The judge withheld parenting time from defendant until he completed "ongoing, in person therapy" to address the concerns expressed by Drs. Abrams and Dasher.

A-2156-21

The judge ordered the parties to confer with each other regarding important decisions affecting the children, with plaintiff retaining ultimate decision-making authority. He held that defendant could move for joint legal custody after supplying written documentation demonstrating progress in therapy, including addressing Dr. Abrams' concern for his Asperger's Syndrome and Dr. Dasher's concern for his narcissism.

3. Admission of Evidence Regarding Custody

We note at the outset that any custody arguments as to E.M. are now moot, as he reached the age of majority on March 13, 2024. Nonetheless, we consider defendant's contentions as V.M. remains a minor.

Defendant first asserts the judge erred in refusing to accept testimony from various experts including Drs. Pasternak, Abrams, and Linet.

"We defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). We review "[t]he trial court's evidentiary ruling[] '. . . under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). "Under that deferential standard, we review a trial court's evidentiary

ruling only for a 'clear error in judgment.'"  State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

We begin with Dr. Pasternak.  At trial, defense counsel himself suggested that Dr. Pasternak did not need to testify, stating, "I don't know that Dr. Pasternak frankly is going to be able to add a whole lot to what she already said in both her report and in her deposition testimony."  Defense counsel then agreed to rely on that evidence in lieu of trial testimony and Judge Bottinelli stated he would accept the expert's report without her testimony.  As defense counsel chose not to produce Dr. Pasternak as a witness, defendant cannot now claim error.

Defendant also broadly argues that the judge erred in not permitting Dr. Abrams to testify as an expert.  As discussed, the Essex County judge granted defendant's application to replace Dr. Abrams with Dr. Linet as defendant's custody expert.  Although the court barred Dr. Abrams's reports as to custody issues, it permitted Dr. Abrams to present expert opinion on other matters, such as parental alienation.  Despite these parameters, and over the continued objection of plaintiff's counsel, Judge Bottinelli allowed Dr. Abrams to testify at length over multiple days of trial.  Dr. Abrams described in detail the history of this matter, including many aspects pertaining to custody.

A-2156-21

In the opinion accompanying the FJOD, Judge Bottinelli appears to have accepted Dr. Abrams's expert opinion regarding her psychological evaluation of defendant but did not credit her testimony about custody and parental alienation. The judge's determination was supported as Dr. Abrams testified that she could not reach a firm opinion about custody and defendant produced another expert to testify on those topics. Furthermore, Dr. Abrams's credibility was undermined after she asked the court to disqualify her on several occasions during her testimony because she did not want to participate any longer in the trial.

Judge Bottinelli did not abuse his discretion in handling the testimony of Dr. Abrams. To the contrary, he gave defendant great latitude in his examination of the expert.

As to Dr. Linet, defendant argues the court erred in its instruction to Dr. Linet not to rely on Dr. Abrams's reports in his testimony. At trial, Dr. Linet attempted to quote an interim report issued by Dr. Abrams regarding custody. There was no error in Judge Bottinelli's instruction. The reports were barred under the court's prior order.

A-2156-21

Judge Bottinelli conducted a thorough analysis of the statutory custody factors and his findings are supported by the record. We see no reason to disturb the judge's custody decision.

B. Equitable Distribution

Defendant contends the judge erred in its equitable distribution determinations. Under N.J.S.A. 2A:34-23.1, the court must consider a number of factors when determining the equitable distribution of the parties' assets and liabilities. The statutory factors are "used in concert with the facts of each case," and inform the otherwise "broad discretion" accorded to the trial judge. Steneken v. Steneken, 367 N.J. Super. 427, 434-35 (App. Div. 2004).

As a result, "[w]here the issue on appeal concerns which assets are available for distribution or the valuation of those assets, it is apparent that the standard of review is whether the trial judge's findings are supported by adequate credible evidence in the record." Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443-44 (App. Div. 1978). When the issue involves the manner in which the trial court allocated the marital assets, the trial court's determination is subject to an abuse of discretion standard. See id. at 444.

As with his determination of custody, Judge Bottinelli thoroughly analyzed the statutory factors for equitable distribution: As to the duration of

the marriage, he found that the marriage began on October 18, 2004. Regarding the age and physical and emotional health of the parties, the judge found plaintiff was thirty-eight years old with no medical conditions, and that defendant was sixty-one years old and claimed to be suffering from several maladies affecting his ability to work, though no evidence was presented to support that contention. As to the income or property brought to the marriage, the judge found that defendant's business revenues steadily escalated until 2017, and that defendant funded the Department of Labor fine in excess of $300,000. Addressing plaintiff, the judge found that she and Viktoriya came to the United States with approximately $90,000, as supported by bank records.

Regarding the standard of living established during the marriage, the judge noted its findings on spousal support (discussed below), but observed that the parties maintained a comfortable standard of living including travel, Florida timeshares, savings toward the purchase of rental apartments, and a renovation of the marital residence. The judge found the factor regarding the existence of any written agreement concerning property inapplicable. Addressing the economic circumstances of each party at the time the division of property becomes effective, the judge found that plaintiff was gainfully employed and had worked to improve her economic position and earned in excess of $100,000

annually, and that defendant had not met his support obligations. The judge rejected defendant's assertion of a business downturn and found that he lived comfortably in the marital home, employed a housekeeper and traveled regularly, and further found that he engaged in "unusual" business practices as SpaceAge paid his personal expenses.

As to the income and earning capacity of each party, the judge noted his findings elsewhere in the opinion, which recited the parties' educational and employment histories. Regarding the contribution by each party to the education, training or earning power of the other, the judge found that plaintiff was given the opportunity to learn new skills while employed at SpaceAge, some as a result of defendant's training.

As to the contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation of the marital property, the judge found that both parties contributed to the acquisition of the investment properties and the increase in SpaceAge's value. However, the tactics employed by defendant and his counsel had prolonged the case and required the liquidation of four investment properties to fund the litigation.

As to the tax consequences of the proposed distribution, the judge found that neither party addressed this issue at trial. Similarly, regarding the present

value of the property, the judge found that 2011 values were provided but there was no evidence of the then-current value of the marital property.

Regarding the need of a parent who has physical custody of a child to own or occupy the marital residence, the judge found this factor inapplicable. As to the debts and liabilities of the parties, the judge cited the mortgages on the remaining apartment units but found the specific loan balances were not addressed at trial. He also found that plaintiff borrowed $200,000 from a litigation funding company to finance this litigation and owed the lender $330,000 at the time of trial. The judge stated defendant enjoyed the benefit of SpaceAge's corporate counsel, failed to pay support obligations, and took more than $200,000 from the children's UTMA accounts. As to the need for creation of a trust fund, the judge found that there was a need to replenish the UTMA accounts.

Addressing the extent to which a party deferred achieving their career goals, the judge found the factor inapplicable. Finally, as to any other factors which the judge might deem relevant, he found that a "disproportionate division of proceeds" was appropriate because defendant unilaterally took depreciation on all of the rental units and wrote off management fees. Finally, the judge

A-2156-21

found the payments to Viktoriya were gifts, and that it would consider those gifts in its analysis.

As stated, the judge ordered the sale of all the remaining apartment units, directing the proceeds of the marital residence as well as the remaining rental units be paid sixty-five percent to plaintiff and thirty-five percent to defendant. He also ordered the proceeds of the sale of the SpaceAge offices be paid forty percent to plaintiff and sixty percent to defendant. The judge awarded plaintiff the one-bedroom timeshare and awarded defendant the two studio timeshares that he purchased.

Defendant asserts the judge erred in awarding plaintiff sixty-five percent of the proceeds of the sale of the marital residence because he purchased the unit with his own funds, albeit during the marriage. We are unpersuaded.

The evidence established that the couple purchased the unit during the marriage, although defendant had rented the unit previously, and it was purchased in cash using defendant's savings, accumulated both before and during the marriage. Further testimony established that plaintiff managed extensive renovations of this unit.

In <u>Olen v. Melia</u>, 141 N.J. Super. 111, 113 (App. Div. 1976), this court held that a marital residence purchased during the marriage is subject to

equitable distribution, even though the funds for the down payment came from the husband's pre-marriage savings and the husband made all mortgage payments out of his own income, because the wife contributed to its post-marriage increase in value.

Here, the judge's award of sixty-five percent of the proceeds of the marital residence to plaintiff was not error and is consistent with <u>Olen</u>. The court conducted a thorough review of the equitable distribution factors and its findings were supported by the evidence in the record and entitled to deference. In addition, although plaintiff received sixty-five percent of the marital unit proceeds, the court equitably awarded defendant a greater share of the proceeds of the SpaceAge units.

<u>1. Credit for Marital Debts</u>

We next address defendant's assertion that the court erred in refusing to grant him credits for certain marital debts. We again will only disturb the judge's determination if the findings are not supported by adequate credible evidence in the record. <u>Borodinsky</u>, 162 N.J. Super. at 443-44.

<u>a. IRS Debt</u>

Defendant contends he is entitled to a credit of $92,388 paid to the IRS for a "marital debt" on the parties' joint 2010 tax return after audit. Defendant

A-2156-21

testified he paid the debt in installments from 2012 through 2015. The only evidence produced in support of the testimony was defendant's August 10, 2015, check for $13,000, apparently toward this amount.[10] However, the record also includes a notice from the IRS stating the $13,000 was an overpayment, of which $12,393.87 was applied toward defendant's 2012 taxes, and $606.48 was refunded. The judge did not expressly award any credit on this issue but acknowledged that the IRS audit occurred and resulted in a significant balance due.

We see no error in the decision to omit credit for this debt. There was contradictory evidence in the record regarding the debt and its repayment. The judge reasonably concluded that defendant was not entitled to a credit and its decision is entitled to deference.

b. Credit Card Spending

Defendant asserts he is entitled to a credit for plaintiff's credit card spending in anticipation of the divorce filing, and for approximately six weeks after, totaling approximately $69,000.

---

[10] Defendant's appendix includes several other checks signed by defendant and made payable to the Department of Treasury in 2015 but there is no specific testimony regarding these checks and it is unclear if they were connected to marital debt.

Plaintiff conceded she spent significant sums on the marital credit card around the time of the filing of the complaint, including for extra food and clothing for the children and furniture to establish the children's new residence, as well as a retainer of $7,500 for her attorney. Among these charges were $600 at Toys R Us, $965 at Gymboree, $766 at Children's Place, and many purchases at Restaurant Depot. However, defendant conceded plaintiff charged approximately $52,000 to the credit card to pay off unspecified timeshare mortgages, and that she applied the refund from their joint tax return to the credit card balance. The FJOD did not include a credit to defendant for plaintiff's spending.

The judge's decision is supported by the evidence that the great majority of the charges went toward the payoff of the mortgages on one or more of the marital timeshares and was satisfied by the couple's tax refund. The remainder of the charges was spread over several months, including March 2011 before pendente lite support was ordered, and was for food and other necessities for the children. The judge was within his afforded discretion to deny a credit for these charges.

81

c. $22,000 Advance

Defendant contends he is entitled to a credit for the $22,000 advance paid to plaintiff in 2012, plus interest. This argument is meritless.

When the couple's adjustable-rate mortgage payment declined in 2011, defendant continued to pay plaintiff the same amount toward that mortgage, causing her to receive approximately $2,000 extra for eleven months, or $22,000. This was raised in a motion and the court treated it as an "advance on equitable distribution" and allowed plaintiff to keep $11,000 and repay $11,000 to defendant. Defendant's half of the $22,000 was repaid by a reduction in the spousal support owed to plaintiff each month.

The FJOD acknowledged "the pendente lite advance on equitable distribution by the motion judge." Accordingly, Judge Bottinelli reasonably concluded that both parties already received their share of these funds as an advance on equitable distribution and required no credit.

d. Timeshare Credit

Defendant asserts he is entitled to a credit of $10,484.47 spent on the timeshares with post-separation income. Defendant does not specify in his brief the precise nature of the funds spent, whether they went toward a mortgage balance, maintenance, or other items, and whether they went toward the joint

82

unit, Viktoriya's unit, or the two units he purchased separately. Defendant has not demonstrated entitlement to a credit.

e. Expert Fees

Defendant seeks a $77,512 credit for expert fees he paid in this matter against his equitable distribution obligation. Throughout the litigation, and at the court's direction, defendant was ordered to pay fees to several experts as well as for custody evaluations.

We have stated that a court may order a party to pay certain expert fees "to assure a level playing field between the parties." Slutsky, 451 N.J. Super. at 368; see R. 5:3-3(i). Defendant's income was significantly higher than plaintiff's throughout most of the litigation. Further, defendant's own delays, lack of cooperation, and misconduct increased the expert fees. Defendant's litigiousness resulted in several custody experts refusing to work with the family. We are satisfied the judge was within his afforded discretion to require defendant to pay some of the fees and he is not entitled to a credit for the payments. We also note the court, in its discretion, also permitted some of defendant's own expert expenses to be paid from the joint litigation fund.

83

## 2. Additional Awards of Marital Assets

We turn to defendant's contentions alleging error in the award of other marital assets.

### a. Car, Jewelry, and the Payments to Viktoriya

Plaintiff certified in early interrogatory responses that any marital jewelry was worth less than $2,000, and the marital 2008 Hyundai was worth $13,000. At trial, there was testimony that the couple continued to share use of the car, which aged significantly during the prolonged litigation. The judge reasonably omitted any award as to these items. The car and jewelry were de minimis assets and there was no expert testimony as to specific values.

Defendant also alleges he should be compensated for the $291,000 paid to Viktoriya. We are satisfied the court's decision to consider the transfer of monies to be gifts was supported by the evidence in the record. Both parties testified that defendant was aware of some or all of the payments to Viktoriya and acquiesced in those payments without any demand for repayment.

In addition, defendant or SpaceAge willingly paid all of Viktoriya's living expenses when she first came to the United States. Thereafter, the parties' finances were intertwined with those of Viktoriya and defendant routinely authorized or permitted payments to her. There was also evidence of a pattern

of gifting, as defendant's relative testified that defendant made financial gifts to his family in India and owned the home in which his father lived. The court reasonably exercised its afforded discretion in finding the payments to Viktoriya were gifts, and expressly considered those gifts in its equitable distribution of the remaining marital apartments and timeshares.

### b. SpaceAge Units

Defendant asserts error in the court treating the SpaceAge units, which Viktoriya purchased during the marriage and he subsequently purchased from Viktoriya after the divorce filing, as marital assets. We are unconvinced.

The evidence established that the couple jointly agreed to this purchase and as the judge found, they decided to title the units in Viktoriya's name because of concerns about ongoing litigation involving SpaceAge as well as the parties' numerous existing mortgages for the rental units. The court found that Viktoriya purchased both units for a total of approximately $468,000, of which $376,426 was paid by a mortgage and $81,575 via a down payment, portions of which were paid by the parties and Viktoriya herself. The court found that defendant or SpaceAge paid rent to Viktoriya totaling $208,000 but there was no formal lease. It further found defendant paid Viktoriya $110,000 to purchase

the units.  The court awarded plaintiff forty percent of the proceeds of the sale of these units and awarded defendant sixty percent of the proceeds.

To be subject to equitable distribution, property must be "legally and beneficially acquired" during the marriage.  N.J.S.A. 2A:34-23(h)(1).  Property may be "legally and beneficially" acquired when a person "acquires a title which carries with it the effective power to control or use or enjoy."  Mey v. Mey, 79 N.J. 121, 124 (1979).  If an asset is "acquired" during the marriage, the name or form in which title is held has no bearing on whether the asset is included in the marital estate.  See Daeschler v. Daeschler, 214 N.J. Super. 545, 551-52 (App. Div. 1986) (stating assets accumulated during marriage are subject to equitable distribution, "irrespective of title thereto"), abrogated in part by, Freda v. Com. Tr. Co. of N.J., 118 N.J. 36 (1990).

We see no error in the judge's determination that these units were marital assets.  The parties and Viktoriya collaborated to obtain the units and crafted an arrangement to secure the purchase.  Plaintiff and defendant each contributed significantly to the purchase price.  Thereafter, plaintiff and defendant were able to control, use, and enjoy the premises without a formal lease or predictable rent obligation, although defendant admits he gave Viktoriya money to pay down the mortgages.  The units were legally and beneficially acquired during the

marriage, as they were obtained via the parties' joint efforts and funds and merely titled to Viktoriya. Defendant's individual purchase of these units after the divorce filing does not defeat their status as marital assets.

c. Business Valuation of SpaceAge

Defendant argues the judge erred in awarding plaintiff $130,888 for an increase in the value of SpaceAge because the judge accepted Petrucelli's valuation despite admitted inaccuracies and without a full cross-examination.

Again, Petrucelli testified that his August 2013 report concluded that SpaceAge was worth $202,552 as of October 2004, $190,182 as of March 2008, and $691,207.83 as of February 2011. He amended but did not rescind this report after defendant provided additional records for 2011. In the amended report, the expert concluded SpaceAge was worth $857,000 as of February 24, 2011, but offered no update to the values for 2004 and 2008.

Defendant's expert, Goldberg, did not testify but his report was admitted into evidence and stated that SpaceAge was worth $445,000 as of March 2005, $560,000 as of March 2008, and $870,000 as of March 2011.

In its equitable distribution award, the judge awarded plaintiff twenty percent of the increase in SpaceAge's value from 2004 until 2011, which the court calculated as equaling $130,888. The judge relied on Petrucelli's figures

A-2156-21

and found that SpaceAge was worth $202,560[11] as of October 2004, and $857,000 as of February 2011. The judge found Petrucelli to be well-qualified, straight forward, and he clearly explained his reasoning. The judge found that plaintiff's efforts substantially contributed to the growth of SpaceAge and that she was entitled to a twenty percent share of this increase in value during the marriage. We are satisfied the judge's valuation is supported by the record.

We also see no merit to defendant's contention that he did not have the opportunity to fully examine Petrucelli. The record reflects defense counsel cross-examined Petrucelli at length over the course of two days. At the close of the second day, defense counsel did not affirmatively seek to bring Petrucelli back for additional testimony.

Under N.J.R.E. 611, the trial court is required to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." That mandate includes the ability to "curtail questioning to avoid repetition and ensure that the testimony stays focused only on relevant issues." State v. Pinkston, 233 N.J. 495, 511 (2018). We see no error in the judge's handling of Petrucelli's testimony.

---

[11] This figure is $8 more than Petrucelli's testimony initially established.

C. Spousal Support

Defendant raises numerous issues regarding the court's award of spousal support. After careful consideration, we find them meritless.

"[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). In awarding alimony, the court must consider the thirteen factors enumerated in N.J.S.A. 2A:34-23(b), along with any other factors deemed relevant. Heinl v. Heinl, 287 N.J. Super. 337, 344-45 (App. Div. 1996). The court must articulate specific findings of fact and conclusions of law with respect to the factors.

"A Family Part judge has broad discretion in setting an alimony award . . . ." Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012). Again, because of the family courts' special jurisdiction and expertise in family matters, we accord deference to family court factfinding. Cesare, 154 N.J. at 413. "Of course, [as to alimony] the exercise of this discretion is not limitless[,]" and is "frame[d]" by the statutory factors set forth in N.J.S.A. 2A:34-23(b). Steneken, 367 N.J. Super. at 434.

We will not disturb an alimony award if the trial judge's conclusions are consistent with the law and not "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice." Foust v. Glaser, 340 N.J. Super. 312, 316 (App. Div. 2001) (quoting Raynor v. Raynor, 319 N.J. Super. 591, 605 (App. Div. 1999)). The question is whether the trial judge's factual findings are supported by "adequate, substantial, credible evidence" in the record and the judge's conclusions are in accordance with the governing principles. Ibid.

Judge Bottinelli began his thorough analysis by acknowledging the initial $3,000 per month pendente lite spousal support award which was reduced to $1,000 per month upon plaintiff's cohabitation with her first boyfriend, retroactive to July 2012. The judge found these awards were insufficient to allow plaintiff to maintain the marital lifestyle and undertook a comprehensive analysis of each of the statutory factors.

As to the actual need and ability of the parties to pay, the judge found "no question" that defendant had the ability to pay support even beyond the $3,000 per month previously awarded because of his stated individual income, which exceeded $225,000 in some years. The judge found the $3,000 monthly spousal support award omitted a savings component, which he determined to be equal

to "at least the annual salary earned by . . . plaintiff from employment at SpaceAge," or $39,915.18. The judge concluded that defendant used SpaceAge as his "private piggy bank" because he used it to pay his personal expenses, took loans as needed, and paid himself "rent" on the SpaceAge offices when it suited him.

Regarding the duration of the marriage, the judge found the marriage began on October 18, 2004, and continued until the filing of the complaint on February 24, 2011, for a duration of seventy-six months. As to the age, physical and emotional health of the parties, the judge reiterated his findings previously made adding that defendant failed to demonstrate he suffers from any medical condition affecting his ability to work.

Regarding the standard of living, the judge relied on his earlier findings without explicitly calculating the marital lifestyle.[12] The judge appears to have largely credited plaintiff's estimates of the marital lifestyle as established in her 2011 CIS—roughly $180,000 per year. The judge found plaintiff earned

---

[12] While recent caselaw calls for a numerical quantification of the marital lifestyle, S.W. v. G.M., 462 N.J. Super. 522, 532 (App. Div. 2020), defendant has not raised this issue on appeal. An issue not briefed on appeal is waived. See Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008).

$104,000 at the time of trial and that defendant determined his own compensation from SpaceAge. The judge stated that defendant had the "ability to have a lifestyle well in excess of that enjoyed by his spouse."

Concerning the earning capacities and employability of the parties, the judge found that plaintiff held a graduate degree and had many years of work experience, and that defendant was a graduate of military school and owned his own business as a computer programmer. As to the length of absence from the job market of the party seeking maintenance, the court found that plaintiff was out of work for approximately eighteen months following her termination from SpaceAge.

Regarding the parental responsibilities for the children, the judge found that plaintiff had been solely responsible for the children and their upbringing since September 2017 and would continue to be until defendant complied with the court's custody and parenting time directives. The judge found that the time and expense necessary to acquire sufficient education factor was not addressed at trial.

As to the history of the financial or non-financial contributions to the marriage by each party, the judge noted plaintiff's role in the children's upbringing and defendant's failure to pay the ordered child support. He found

92

that plaintiff and Viktoriya had been responsible for meeting the children's needs.

Regarding the equitable distribution ordered, the judge referenced that section of his opinion. As to the income available through investment of any assets, the judge cited the parties' rental apartment units. Concerning the tax treatment of any alimony award, the judge held that alimony would not be tax deductible for defendant nor included as income to plaintiff. As to the pendente lite support paid, the judge reiterated its earlier discussion of the pendente lite awards. Regarding any other factors which the judge might deem relevant, the judge cited its "previous discussions."

After weighing these factors, particularly the absence of a savings component in the initial award, Judge Bottinelli concluded that spousal support would be fixed at $4,714 per month from the date of the complaint until August 1, 2016, the date plaintiff stipulated to cohabitation with Rothstein. Therefore, limited durational spousal support was set for 65 months, totaling $306,410. Defendant was credited $13,650 for rent paid by the first boyfriend, as well as "$40,700 in payments [defendant] made and monies which were seized by [p]robation." The judge ordered defendant to pay plaintiff the balance—$252,054—in spousal support arrears.

A-2156-21

We turn to a discussion of the specific errors alleged by defendant regarding the spousal support award.

## 1. Length of the Marriage

Defendant challenges the judge's finding that the legal marriage occurred in October 2004. We have already set forth the conflicting testimony regarding this issue.

The judge expressly found that the marriage began on October 18, 2004, when the couple "participated in a religious ceremony to bless their marriage." He found that the parties held themselves out to be married after that date for tax purposes and when buying property. We defer to this factual finding, see Cesare, 154 N.J. at 411-12, as supported by the evidence, including plaintiff's and one of defendant's relative's sworn testimony.

## 2. Cohabitation

Defendant asserts the judge erred in its cohabitation analysis because it required him to prove cohabitation, rather than allowing him to present a prima facie case of cohabitation and then shift the burden of proof to plaintiff. The assertion lacks merit.

N.J.S.A. 2A:34-23(n) provides:

> Alimony may be suspended or terminated if the payee cohabits with another person. Cohabitation involves a

94

mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household.

Significantly, there is a rebuttable presumption of changed circumstances arising upon a prima facie showing of cohabitation. Ozolins v. Ozolins, 308 N.J. Super 243, 248 (App. Div. 1998). The burden of proof, which is ordinarily on the party seeking modification of the support award, shifts to the dependent spouse to show there is no economic benefit. Id. at 248-49.

In light of defendant's allegation of plaintiff's cohabitation with both the first boyfriend and Rothstein, there was significant trial testimony on this issue. In the FJOD, Judge Bottinelli separately analyzed the statutory cohabitation factors in N.J.S.A. 2A:34-23(n) as to both gentlemen and made factual findings which are not specifically challenged.

The judge did not find true cohabitation with the first boyfriend but awarded a credit of $1,050 per month for the thirteen months when the boyfriend contributed to plaintiff's rent. The judge did find plaintiff cohabited with Rothstein beginning in August 2016 based on its analysis of the statutory factors and plaintiff's stipulation. But the judge did not find cohabitation from 2013 to

2016, when plaintiff stated she lived in a separate unit in Rothstein's home and he was barred from contact with the children.

The judge did not require defendant to prove cohabitation. To the contrary, the judge allowed plaintiff to present significant testimony on this issue, including testimony about the economic impact of her alleged cohabitation consistent with Ozolins. She described her financial affairs, including her payment of rent to Rothstein. After hearing this evidence, the judge found that cohabitation with Rothstein began in August 2016.

### 3. Calculation of Past Payments

Defendant contends the judge erred in not awarding him credits for the amounts he paid in spousal support. In his decision, the judge relied on a probation report to determine the amount defendant had paid. Defendant alleges the report was incorrect and that he had provided the correct document in the record. He did not.

Rule 2:6-1(a)(1) provides:

> The appendix prepared by the appellant or jointly by the appellant and the respondent shall contain . . . (I) such other parts of the record, excluding the stenographic transcript, as are essential to the proper consideration of the issues . . . .

Since defendant has not provided the necessary documentation to demonstrate even the possibility of error, we cannot perform a meaningful review of the issue. Therefore, we accord the court its due deference and find no error.

4. Child Support

Defendant contends the court erred in its child support award. We disagree.

Child support awards and modifications are "left to the sound discretion of the trial court" and we are limited to determining whether there was an abuse of discretion. Innes v. Innes, 117 N.J. 496, 504 (1990). As we have stated, "[t]he trial court has substantial discretion in making a child support award. If consistent with the law, such an award 'will not be disturbed unless it is manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice.'" Foust, 340 N.J. Super. at 315-16 (citation omitted) (quoting Raynor, 319 N.J. Super. at 605) (internal quotation marks omitted).

"An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Conforti v. Cnty. of Ocean, 255 N.J. 142, 192 (2023)

(internal quotes omitted) (quoting <u>Flagg v. Essex Cnty. Prosecutor</u>, 171 N.J. 561, 571 (2002)).

Rule 5:6A provides that the Child Support Guidelines "shall be applied [in] an application to establish or modify child support" and may only be modified for good cause shown. Where the family income exceeds $187,200, "the court shall apply the guidelines up to $187,200 and supplement the guidelines-based award with a discretionary amount based on the remaining family income" together with the factors specified in N.J.S.A. 2A:34-23. Child Support Guidelines, Pressler & Verniero, <u>Current N.J. Court Rules</u>, Appendix IX-A to <u>R.</u> 5:6A, ¶ 20(b) www.gannlaw.com (2025). <u>See also Isaacson v. Isaacson</u>, 348 N.J. Super. 560, 581 (App. Div. 2002) (noting the "maximum amount provided for in the guidelines should be 'supplemented' by an additional award determined through application of the statutory factors set forth in N.J.S.A. 2A:34-23(a)").

Nevertheless, it is well within the trial court's discretion to determine "the choice of the methodology to employ in arriving at a child support award when the total income of the parties exceeds the guidelines," recognizing that the "goal is to calculate a child support award that is in the best interest of the child after

giving due consideration to the statutory factors and the guidelines." Caplan v. Caplan, 182 N.J. 250, 272 (2005).

N.J.S.A. 2A:34-23(a) establishes the factors a court shall consider "[i]n determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed."

Throughout his decision, Judge Bottinelli carefully addressed each of the statutory factors. As to the needs of the children, the judge found their needs would change as they aged and noted their increased commuting expenses to private high schools. Regarding the standard of living and economic circumstances of each parent, the judge discussed the family living together in their apartment in Jersey City and found the children's then-current home was "in line" with the marital standard.

As to all sources of income and assets of each parent, the judge first recognized the case involved an income situation in excess of $187,200 under the Child Support Guidelines. The judge noted plaintiff earned an average of $39,915.18 during the marriage, and after the complaint filing, her salary increased to approximately $100,000. The judge also discussed defendant's earnings and noted a significant drop in his gross income beginning in 2017. He outlined defendant's W-2 earnings of $340,000 in 2010, which dropped to

$57,417 by 2020, and separately addressed his income from the rental properties. The judge noted Petrucelli's conclusion, that with defendant's years of experience, his annual W-2 salary should be approximately $207,040 for 2017 and thereafter. The court determined that it was in the best interests of the children to impute income to defendant from 2017 onward of at least $207,040.

Regarding the earning ability of each parent, the judge reiterated his prior findings. As to the need and capacity of the children for education, the judge found they were very intelligent and would continue their education beyond high school. Concerning the age and health of the child and each parent, the judge renewed his prior findings. As to the income, assets, and earning ability of the children, the judge discussed defendant's use of their UTMA funds.

Concerning the responsibility of the parents for the court-ordered support of others, the judge found this factor inapplicable. As to the reasonable debts and liabilities of each child and parent, the judge found the children had no debts and the parents' debts were addressed in the equitable distribution determination.

After analyzing the factors, the judge found the "floor" award of $589 under the Child Support Guidelines needed to be increased because of the family's high income. He ordered defendant to pay child support of $619 per week from 2011 through 2020. The judge held that as of September 2020, the

amount would increase to $675 per week because of the ages of the children and their growing extraordinary expenses.

We are satisfied the judge conducted a reasoned analysis of the applicable factors and entered an award that was consistent with the evidence in the record. He properly utilized the Child Support Guidelines and included an additional award in light of the family's high income. We briefly address defendant's challenges to the child support award.

a. UTMA accounts

Defendant argues the judge erred in finding he created an irrevocable trust when he put funds into the children's UTMA accounts, and in converting those funds into a child support obligation. This argument lacks merit.

In the FJOD, the judge found that defendant opened UTMA accounts for both children, then deposited and subsequently removed $50,830 from V.M.'s account and $161,354 from E.M.'s account. The judge ordered defendant to repay $212,184 plus interest of $12,801, for a total of $224,985. This sum was to be paid from the litigation fund and considered a child support obligation.

N.J.S.A. 46:38A-24 plainly provides that transfers to a UTMA account are "irrevocable, and the custodial property is indefeasibly vested in the minor."

The judge was within his afforded discretion to order the repayment of these funds as the monies belonged to the children and had to be repaid.

Defendant briefly argues the money he deposited into the UTMA accounts was not his, but rather marital property. However, the evidence is clear that the funds included, among other things, defendant's post-complaint SpaceAge salary and SpaceAge's office rental payments.

Defendant further argues the judge erred in not considering the UTMA funds as a factor to reduce the "need" of the children for child support purposes. However, N.J.S.A. 46:38A-34 plainly provides that UTMA funds are "in addition to, not in substitution for, and does not affect any obligation of a person to support the minor." See also Colca v. Anson, 413 N.J. Super. 405, 416 (App. Div. 2010) ("[A] child's assets may not be used to fulfill a financially able parent's support obligation.").

b. $60,000 Credit

Defendant contends the judge erred in failing to credit him $60,000 in child support paid by check for the twenty months from April 2011 until November 2012.

The judge calculated there were 446 weeks from the filing of the complaint until September 1, 2020, and 128 weeks from that time until the date

102

of the opinion on February 15, 2022, resulting in defendant owing $276,074 for the initial period and $86,400 through the date of the opinion, for a total of $362,474. The judge stated the "most recent child support financial audit report from the Child Support Enforcement System" dated January 14, 2022, showed that defendant was credited with $248,486.14 in child support payments since the filing of the complaint, leaving arrears of $113,988. That document is not included in the record.

Defendant relies on an earlier document dated October 4, 2021 to support his argument and states it is the document to which the judge refers to in its opinion. That contention is disingenuous as the judge explicitly refers to a calculation in a January 14, 2022 record.

As stated, Rule 2:6-1(a)(1)(I) requires an appellant to provide this court with the parts of the record that "are essential to the proper consideration of the issues." Defendant has failed to include the documents necessary to address this argument. The record does not include the "most recent child support financial audit report from the Child Support Enforcement System" dated January 14, 2022, on which the judge relied, and defendant does not allege any error in the judge's reliance on that document. Defendant's omission precludes review of the judge's decision on this point and he thus failed to demonstrate error.

c. 2012-2017 Support

Defendant asserts the judge erred in finding he owed child support for the period of 2012 to 2017, when he had custody of the children four nights per week. The judge referenced the shared parenting schedule in place during parts of that timeframe in the FJOD.

Under the Child Support Guidelines, in shared-parenting arrangements, costs are shared by the parents in proportion to their relative incomes only, not in proportion to time spent with the children. Child Support Guidelines, Pressler & Verniero, Appendix IX-A to R. 5:6A, ¶ 14(f).

The judge appropriately acknowledged the custody arrangement between 2012 and 2017 and nonetheless found that child support should be the same amount throughout the course of the litigation, irrespective of custody. It recognized that even though the parties had equal parenting time from 2012 to 2017, plaintiff still had a need for child support. The findings are consistent with the guidelines, which reflect that child support obligations must consider the relative incomes of the parties. Defendant earned significantly more than plaintiff throughout most of the marriage and the pendente lite period.

A-2156-21

d. Imputed Income

Defendant briefly argues the judge erred in imputing income to him because his income dropped when he was in jail following his arrest at West Point. The allegation is meritless.

In the FJOD, the judge found it was in the best interest of the children to use an imputed income figure for defendant, because his income had dropped in 2017 and because of considerations involving the rental income paid by SpaceAge. The judge credited an estimate that defendant's salary should be approximately $207,040 from 2017 onward based on data from the New Jersey Department of Labor and the Bureau of Labor Statistics, as included in Petrucelli's report.

Both the Child Support Guidelines and case law permit imputation of income when determining child support obligations. See Tash v. Tash, 353 N.J. Super. 94, 99 (App. Div. 2002). Further, we have stated that "[t]he potential earning capacity of an individual, not his or her actual income, should be considered when determining the amount a supporting party must pay." Halliwell v. Halliwell, 326 N.J. Super. 442, 448 (App. Div. 1999).

The judge did not err in imputing income to defendant. He did so using an estimate offered by a qualified expert. Defendant's argument that his income

declined because he was incarcerated for two weeks in 2017 but remained in contact with his business is disingenuous. There was no testimony that the incarceration adversely affected his business.

D. Sanctions

Defendant challenges the entry of orders for sanctions during the litigation and in the FJOD.

This court has described the imposition of a monetary sanction as "an entirely proper tool to compel compliance with a court order." Franklin Twp. Bd. of Educ. v. Quakertown Educ. Ass'n, 274 N.J. Super. 47, 55 (App. Div. 1994). Monetary sanctions "must be fashioned in an amount sufficient to sting and force compliance[] but must not be so excessive as to constitute ruinous punishment." E. Brunswick Bd. of Educ. v. E. Brunswick Educ. Ass'n, 235 N.J. Super. 417, 422 (App. Div. 1989). We review a trial court's imposition of sanctions under an abuse of discretion standard. See Innes v. Carrascosa, 391 N.J. Super. 453, 498 (App. Div. 2007).

1. Fees and Sanctions for the Skype Call

In April 2021, the judge granted defendant's request that the children have a Skype call with his father, to which plaintiff consented. However, the judge found defendant in violation of litigant's rights for making this "multiply denied

106

request for parenting time." In reviewing the proposed order, the judge found defense counsel had "inserted language into the proposed order . . . to, in effect, get around prior orders by mandating [that] the video call with the grandfather take place in [defendant's] home." In addition, counsel added a provision granting defendant "temporary sole, legal, and physical custody of the parties' two minor children until further order of the [c]ourt." The judge described defense counsel's conduct as "outrageous."

The judge ordered defendant to pay plaintiff's counsel its costs of $4,597.50 to defend the motion. The judge further sanctioned defendant's counsel $500 for his failure to comply with Rule 1:6-2(c), which requires conferring with opposing counsel prior to filing an application. The judge noted the Supreme Court's April 2021 order had "expressed a concern of the aggressive, hostile conduct by defendant's counsel" and "instructed that it is proper to sanction counsel for willful conduct obstructing the adjudication of the proceedings."

Pursuant to Rule 1:10-3, a court may impose counsel fees where a party violates an existing order. Here, the judge reasonably imposed counsel fees because defendant sought additional parenting time despite having been denied such time in numerous previous orders, and despite the court's repeated

admonition that it would be addressed at trial. Furthermore, the Supreme Court condoned the sanction in light of counsel's ongoing "aggressive, hostile conduct."

2. Sanctions in the FJOD

In his opinion accompanying the FJOD, the judge entered a $35,000 sanction against defendant, stating:

> After considering the bad faith actions by . . . defendant in repeatedly violating [c]ourt [o]rders which include[,] not only the [g]ag [o]rder[,] but also failing to complete the [last ordered] psychological evaluation . . . and having a non-custody witness ([Dr.] Abrams) present to listen in on the interview with the children, a sanction of $35,000 is imposed.

Rule 5:3-7 authorizes a court to impose an economic sanction on a party for violating an order regarding custody, parenting time, or spousal or child support. Judicially crafted sanctions are not limited to actual damages, but they must be "rationally related to the desideratum of imposing a 'sting' on the offending party within its reasonable economic means." Innes, 391 N.J. Super. at 498 (quoting Pressler & Verniero, Current N.J. Court Rules, comment 4.4.3 on R.1:10-3 (2007)).

The record is replete with defendant's violations of various court orders regarding parenting time, spousal support, and child support, as well as the gag

orders which related to custody. He was repeatedly found to be in violation of litigant's rights and did not complete the court-ordered therapy or the ordered psychological evaluation. Dr. Abrams informed the court that she covertly listened in on the court's confidential conversation with the children at defense counsel's invitation. The judge did not abuse his discretion in imposing the $35,000 sanction in the FJOD.

E. Counsel Fees

Defendant asserts the judge erred in awarding plaintiff almost $2 million in counsel fees.

Rule 4:42-9 permits a court to award fees in a family action upon a weighing of the factors set forth in Rule 5:3-5(c). The court must also consider the mandates of RPC 1.5(a).

Typically, the award of counsel fees and costs in matrimonial actions rests in the sound discretion of the trial court. Williams v. Williams, 59 N.J. 229, 233 (1971). "We will disturb a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion[,]" Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)), or a clear error in judgment, Tannen v. Tannen, 416 N.J. Super. 248, 285 (App. Div. 2010). Where case law, statutes,

and rules are followed and the judge makes appropriate findings of fact, the fee award is entitled to deference. <u>Yueh v. Yueh</u>, 329 N.J. Super. 447, 466-69 (App. Div. 2000); <u>see also</u> Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 4.7 on <u>R.</u> 5:3-5 (2025); <u>J.E.V. v. K.V.</u>, 426 N.J. Super. 475, 492-93 (App. Div. 2012) (a matrimonial matter).

As a threshold matter, Judge Bottinelli found that plaintiff's counsel submitted a comprehensive retainer agreement with supporting documentation and complete billing records. The judge then addressed each of the requisite factors in <u>Rule</u> 5:3-5(c): As to the financial circumstances of the parties, the judge reiterated its prior findings. Regarding the ability of the parties to pay, the judge explained that even with the equitable distribution award and her own earnings, plaintiff would be unable to pay her outstanding counsel fees. He found that defendant had the ability to earn significantly more than he alleged at the time of trial, as his business should be growing and he had developed valuable software. The judge found defendant had acted in bad faith and "dr[o]ve[] up the cost of litigation to an unheard of, and absurd, point."

The judge included a comprehensive discussion of the reasonableness and good faith of the positions advanced by the parties, detailing the significant fees plaintiff incurred in responding to defendant's dilatory conduct. The judge also

provided detailed descriptions of the myriad of instances in which defendant and his counsel "engaged in unreasonable behavior and in bad faith throughout this litigation."  For example, the judge cited defendant's various Facebook and YouTube posts in violation of the gag order, including his statement, "give my children freedom or give me death."

The judge detailed defendant's repeated violations of litigant's rights, including his failure to pay support, as well as his December 2018 interference with obtaining the court-ordered line of credit.  He described defendant's repeated motions to restore custody despite his failure to comply with the court's reunification plans, and his ongoing efforts to vacate the gag orders.

The judge also highlighted defense counsel's description of the Essex County trial judge as a "child predator" and his pursuit of various federal actions, including those against each of the judges handling the matter and on behalf of journalists seeking information about the litigation.  The judge continued, detailing the actions of defendant and his counsel throughout the trial itself, including an opening statement which spanned three trial days, and found that defendant called several witnesses who offered "little or no usable information."

Concerning the extent of the fees incurred by both parties, the judge reiterated its previous discussion of plaintiff's fees and noted the extent of

defendant's and Viktoriya's fees were unknown, as neither submitted a certification of services.

Regarding any fees previously awarded, the judge referenced the awards to plaintiff throughout this matter totaling $31,328.62. As to the amount of fees previously paid by each party, the judge found that plaintiff had already paid a total of $1,008,982.63, including fees to two prior counsel and $550,577.72 to current counsel Pashman Stein. The judge noted there was an outstanding balance owed to Pashman Stein of $1,980,303.20 as of February 3, 2022.

Regarding the results obtained, the judge found plaintiff had been granted a divorce and custody, and that her requests for spousal support, child support, and equitable distribution were addressed. He found that defendant and SpaceAge had "failed to achieve" what was sought in their pleadings.

As to the degree to which fees were incurred to enforce existing orders or to compel discovery, the judge referenced its earlier discussions about plaintiff's and the court's difficulty in enforcing orders, and noted that at least 110 orders had been issued in this case.

Finally, as to any other factor bearing on the fairness of an award, the judge cited the Supreme Court's April 6, 2021 order, detailed above, including its "conclusion that the prior judges recused themselves in this matter based in

part, if not exclusively, on defense counsel's course of conduct" such as "describing the presiding judge as a 'child predator' in court, and driving to the presiding judge's home with a process server roughly one week after a tragic shooting at the home of a federal judge."

Based on his analysis, the judge concluded that defendant's "bad faith throughout this litigation, with the support and encouragement of [defense counsel], is evident and clear." He found that due to defendant's "wanton and willful violations" of the court's orders, plaintiff was forced to incur counsel fees totaling nearly $3 million.

The judge also considered the factors under RPC 1.5(a). As to the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly, the judge found this matter did not present significantly difficult legal issues but was made arduous by the litigious nature of defendant and his attorney. The judge said defendant and his counsel employed "scorched earth" tactics to delay and intimidate both plaintiff and the court.

Regarding the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer, the judge found that plaintiff was acutely aware of the time and attention that would

113

be required of her counsel, and that by undertaking this case, plaintiff's counsel was precluded from accepting other work. He described the "massive" skills necessary to handle the case and the "enormous number of documents" involved. The judge observed that Pashman Stein had spent 4,500 hours on this case since it began its representation of plaintiff, had written off approximately 700 hours of billable time, and waived its standard interest rate on outstanding invoices. The judge concluded that plaintiff's counsel acted professionally and reasonably in the litigation.

Concerning the fee customarily charged, the judge found the hourly rates were fair for the area and within the "range of reasonableness" in matrimonial litigation. He expressly considered the services necessary to vindicate plaintiff's legal rights in light of defendant's litigiousness. As to the amount involved and the results obtained, the judge found that the best interests of the children was paramount here.

As to the nature and length of the professional relationship with the client, the judge found that Pashman Stein's representation began in 2017 and continued to present. Regarding the experience, reputation, and ability of the lawyers, the judge found that lead counsel was experienced and demonstrated an ability to

handle the "delicate and emotional nature" of this case, as a "fierce advocate" for her client. Finally, the judge found the fee was fixed.

The judge advised he had "scrutinized" more than 400 pages of billing records. Although he found some work performed by an associate could have been performed by a paralegal, those billings "pale[d] in comparison to the absolute need for quick legal analysis" so as not to detract from counsel's advocacy or impact the flow of trial. The judge concluded the fee requested was fair and reasonable, and entered the award for $1,980,303.20.

Defendant asserts the court erred in failing to conduct a proper analysis of fees and instead approved the application in its entirety without allowing him to object. We disagree.

Both parties addressed the issue of counsel fees in their closing briefs. Thereafter, Pashman Stein submitted its affidavit of services with supporting invoices to the court and defendant. Defendant did not respond to the application or request additional time from the court to do so.

We are satisfied the judge conducted an exhaustive analysis of the counsel fee application, discussing it over more than fifty pages of his opinion. His findings reflected the misconduct of defendant and his counsel throughout this matter, including defendant's relentless online posts in violation of the gag order,

115

and defense counsel's unprofessional behavior.[13] It was the conduct of defendant and his counsel that prolonged this otherwise straightforward matter and caused plaintiff to incur significant fees. The judge's findings are amply supported by the record and will not be disturbed.

Defendant also contends the court erred in awarding plaintiff fees because she acted in bad faith and falsified evidence during the litigation. As stated, the judge only found bad faith on defendant's (and his counsel's) part.

One consideration in granting an award of fees is whether a party acted in bad faith throughout the litigation. Borzillo v. Borzillo, 259 N.J. Super. 286, 291-94 (Ch. Div. 1992); Williams, 59 N.J. at 233. Bad faith may be demonstrated by misuse or abuse of process, seeking relief which one knows or should know that no reasonable argument could be advanced in fact or law to support, intentional misrepresentation of facts or law, and acts of a losing party that are vexatious, wanton or carried out for oppressive reasons. Borzillo, 259 N.J. Super. at 293-94.

We again discern no error in the fee award. Although there may have been some evidence of misconduct on plaintiff's part, it would only be one

---

[13] In one instance, after being admonished for asking an expert substantive questions during voir dire, defense counsel stated, "[w]ell a lawyer has a right to be obnoxious, Your Honor."

consideration in determining a fee award.  Id. at  291-94.  Further, plaintiff's behavior pales in comparison to defendant's relentless misconduct throughout the litigation.  For the reasons stated, we decline to disturb the fee award.

F. Gag Orders

Defendant argues the court erred in entering "gag orders" against him in April 2014 and June 2015 limiting his online posts about the litigation, and again in 2020 when it barred his contact with private schools his son was applying to. He further alleges error in the judge's decision to uphold these gag orders in the FJOD.

We have already related the history of the gag orders.  The order currently in place only restricts defendant from publicly discussing "any custody information" and from contacting any private high schools regarding E.M.'s applications.[14]

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  This provision was made applicable to the states by the Fourteenth Amendment.  U.S. Const. amend. XIV, § 1.

---

[14]  Since E.M. has reached majority age and has likely matriculated, the second portion of the gag order may be moot.

A-2156-21

Article I, Paragraph 6 of the New Jersey Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." The proponent of a prior restraint on free speech "carries a heavy burden of showing justification for the imposition of such a restraint." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 558 (1976).

A parent's rights, "though fundamentally important, are not absolute." K.H.O., 161 N.J. at 347. In custody matters, "the primary and overarching consideration is the best interest of the child." Kinsella, 150 N.J. at 317. In Borra v. Borra, 333 N.J. Super. 607, 612 (Ch. Div. 2000), the Chancery Division permitted an injunction barring a former husband from opposing his former wife's application to join a country club. The Borra court found that any imposition on his freedom of speech was secondary to the welfare of the children, who would be harmed if "caught in parental conflicts." Id. at 614. Further, at least in civil matters, courts are expressly permitted to impose gag orders. See Payton v. N.J. Tpk. Auth., 148 N.J. 524, 542 (1997) (approving the issuance of gag orders to preserve confidential investigations).

A-2156-21

Under the narrow and unique circumstances presented here, we are satisfied the gag orders were consistent with the best interests of the child standard. Defendant's relentless condemnation of plaintiff and the court system as well as his litigation against E.M.'s school demonstrated a strong justification for a prior restraint consistent with <u>Nebraska Press Association</u>. In addition, <u>Borra</u> supports some reasonable limitation on free speech to protect a child's welfare. We are satisfied the public dissemination of custody information in the manner defendant did so here was appropriately and reasonably limited.

## G. The Trespass Action

Defendant contends the court erred initially in failing to grant summary judgment and in later dismissing his claim for trespass, and in finding no damages.

As stated, the court denied defendant's motion for summary judgment in 2018 regarding his complaint alleging plaintiff trespassed in his apartment. At oral argument on the motion, defense counsel said the trespass was an act of domestic violence or "it could be a civil matter involving domestic violence. But, and[] again, that's just the way it is by law."

The court noted that plaintiff admitted setting one foot in the marital apartment in exigent circumstances and there was "a sufficient issue of fact as

to whether it was warranted based on . . . exigent circumstances." The court also commented the claim for trespass may have been more appropriately brought as one to enforce litigant's rights.

In the FJOD, the judge analyzed the trespass claim in the context of the Prevention of Domestic Violence Act (Act), N.J.S.A. 2C:25-17 to -35, and found that plaintiff's act of "entering defendant's apartment or merely standing at the threshold (where the children had their own room) for the purpose of collecting the children's necessities does not constitute a violation under the . . . Act." The judge found that plaintiff was a "co-owner of the apartment" and even if she was told not to enter the apartment, "the children needed to get their things." The judge separately held, "[a]ny claim . . . for compensation for the asserted tort of 'trespass' is dismissed with prejudice as [defendant] has shown no damages."

An action for trespass in tort arises upon the unauthorized entry onto another's property, real or personal. State v. Wouters, 71 N.J. Super. 479, 485 (App. Div. 1962). Under the Act, "criminal trespass"[15] is listed as a predicate act of domestic violence. N.J.S.A. 2C:25-19(a)(12).

---

[15] A person commits an offense of criminal trespass if, "knowing that he is not licensed or privileged to do so, he enters or surreptitiously remains in any research facility, structure, or separately secured or occupied portion thereof." N.J.S.A. 2C:18-3(a).

In order to decide whether summary judgment is appropriate under Rule 4:46-2(c), "the court must accept as true all the evidence which supports the position of the party defending against the motion and must accord him [or her] the benefit of all the legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995) (alteration in original) (quoting Lanzet v. Greenberg, 126 N.J. 168, 174 (1991)).

On appeal, we review summary judgment orders de novo, utilizing the same standards applied by the trial courts. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). When no issue of fact exists, and only a question of law remains, a reviewing court "affords no special deference to the legal determinations of the trial court." Ibid.

We discern no error in the court's determinations on the summary judgment motion and in the FJOD. Plaintiff was a co-owner of this apartment, which constituted marital property. While a 2011 court order directed her to vacate the apartment, she remained a record owner and an action for trespass in tort clearly requires entry onto the property of "another." As the court rightly concluded on summary judgment, defendant's remedy lay in an application to enforce litigant's rights rather than an action for trespass.

A-2156-21

Furthermore, as the judge added in the FJOD, defendant failed to demonstrate any damages, even nominally, because plaintiff did not commit the tort of trespass by entering an apartment she jointly owned. The children went into the apartment and collected their belongings. There was no error in dismissing the trespass action.

III.

The SpaceAge Action

In this action, SpaceAge sued plaintiff and Viktoriya, alleging they improperly took cash and other benefits from SpaceAge (civil case), and Victoriya owed it for a security deposit it paid to her as the landlord of SpaceAge's office (Special Civil Part case). These cases were consolidated with the Divorce Action and testimony on the issues was taken at trial. Judge Bottinelli considered and dismissed all of the SpaceAge claims.

On appeal, SpaceAge contends the Essex County judge erred in denying its motion for summary judgment as to its security deposit; and Judge Bottinelli erred in dismissing its claims without a trial. We affirm.

SpaceAge moved for summary judgment on its claim that it was owed a security deposit. In support of the motion, defendant certified that the $50,000 check from SpaceAge to Viktoriya in December 2009 was intended to cover

eight months of rent at $5,000 per month, and $10,000 as a security deposit. He stated there was no lease but a draft lease included reference to a $10,000 security deposit. He certified that after he purchased the units from Viktoriya in May 2011, she never refunded the security deposit to SpaceAge.

In opposition to the motion, Viktoriya certified that SpaceAge did not pay her a security deposit. She alleged that a lease was signed, though not the draft document proffered by defendant, and it omitted any security deposit. The record on appeal does not include the signed lease.

After argument, the court noted the draft lease agreement and found a question of fact as to whether the parties intended to include a security deposit in their arrangement. The court further found a question of fact as to whether the security deposit was ever paid to Viktoriya. As a result, the court denied the motion for summary judgment.

In reviewing the order under the standard articulated above, we are satisfied the court correctly denied the summary judgment motion. There were numerous disputed facts as to the nature of the parties' and Victoriya's landlord-tenant relationship, including whether any security deposit was due or paid. The draft lease included in the record, which called for a security deposit, was unsigned. Viktoriya alleged that a different lease governed their relationship

123

and it did not include a security deposit. The December 2009 check, while including reference to both a security deposit and rental payment in the memo line, did not conclusively prove that such a payment was owed.

SpaceAge next contends Judge Bottinelli did not adjudicate this security deposit claim in his FJOD opinion and ignored relevant evidence on this claim that was affirmatively presented at trial.

During the trial, counsel for SpaceAge and defendant presented testimony about each of SpaceAge's claims, including plaintiff's and Viktoriya's alleged theft of petty cash, the payment of benefits to plaintiff and Viktoriya, conversion of the computer equipment, trade libel, and false representation, along with defendant's testimony about the office rental and excessive rental rate and his allegations of trade libel.

Judge Bottinelli's opinion explicitly acknowledged the SpaceAge claims. He commented on the credibility of both parties, finding plaintiff's testimony was "much more credible than that of her husband" because although she "fabricated information and redacted documents," she "admitted when she had been wrong" and was not evasive. In contrast, defendant "repeatedly told untruths during this trial," "refused to abide by [c]ourt [o]rders," and made "outrageous allegations about judges, professionals[,] and others on social

media." The judge found defendant "was lying, and he full well understood that he was lying, and he did so without hesitancy."

The judge's opinion expressly rejected certain of the SpaceAge claims: He found no evidence that Viktoriya breached any agreement with SpaceAge regarding its payment of her expenses; and he dismissed SpaceAge's claim that plaintiff did not return a computer, finding that she denied these claims and there was no proof of loss or proof of value. The judge summarily dismissed the remaining SpaceAge claims, including the claims relating to petty cash, trade libel, false representation, and the security deposit.

The record demonstrates that SpaceAge was given the opportunity to present its claims and related evidence. Counsel for SpaceAge was permitted to present evidence about petty cash, health insurance coverage for plaintiff and Viktoriya, the purchase of the computer for plaintiff, plaintiff's email to the SpaceAge employees, plaintiff's listing of a particular individual as a job reference, and SpaceAge's rental of the office units. Judge Bottinelli ultimately addressed and resolved these claims in the FJOD opinion, concluding that each should be dismissed. SpaceAge was accorded due process as it had "an opportunity to be heard at a meaningful time and in a meaningful manner." Doe v. Poritz, 142 N.J. 1, 106 (1995).

Under our deferential standard, we are satisfied the judge's factual findings were supported by the evidence in the record and he correctly dismissed each of SpaceAge's claims. Balducci v. Cige, 240 N.J. 574, 594-95 (2020).

Despite being permitted the opportunity to do so, SpaceAge failed to prove its claims. For example, as the judge found, there was no testimony that Viktoriya breached any agreement with SpaceAge regarding her expenses, or that plaintiff failed to return the computer. On the remaining claims, SpaceAge presented only scant evidence. The testimony regarding petty cash, trade libel, false representation, and the rental arrangement was conflicting and the judge's determination that such testimony did not prove SpaceAge's causes of action is entitled to deference. Defendant did not even discuss the security deposit claim at trial, despite his lengthy testimony about the office rental. The judge reasonably dismissed all of these claims, particularly in light of his finding that plaintiff's testimony was more credible than defendant's.

To the extent we have not addressed any remaining claims asserted by defendant or SpaceAge, we have determined they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division